# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-20529

COX OPERATING, L.L.C.,

Plaintiff - Appellee

v.

ST. PAUL SURPLUS LINES INSURANCE COMPANY,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

July 30, 2015

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINSON, and COSTA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal presents a dispute over insurance coverage and penalty interest under the Texas Prompt Payment of Claims Act (the Act), Tex. Ins. Code Ann. §§ 542.051–.061. The insured, Cox Operating, L.L.C., spent millions of dollars cleaning up pollution and debris after Hurricane Katrina caused extensive damage to the oil-and-gas facilities it operated. After reimbursing Cox for over $1.4 million of its costs, Cox's liability insurer, St. Paul Surplus Lines Insurance Co., filed this suit in the district court, seeking a declaration that the remainder of Cox's costs were not "pollution clean-up costs" covered by the policy. Cox counterclaimed, and, after a five-week jury trial, the district court entered judgment awarding Cox, among other amounts, $9,465,103.22 in

No. 13-20529

damages for breach of the policy and $13,064,948.28 in penalty interest under the Act for failure to promptly and properly respond to Cox's claims.

On appeal, St. Paul argues that the damages award must be reduced (1) because it includes costs that Cox did not report to St. Paul within one year of the clean-up work and thus are not covered by the policy; and (2) because it includes costs that were already reimbursed by other insurers, a double recovery. St. Paul further argues that the penalty-interest award must be reduced, or eliminated, because the district court calculated the amount of penalty interest after incorrectly determining the date on which interest began to accrue. We find no error and AFFIRM.

I.

Cox operated oil-and-gas-production facilities located in Eloi Bay and Quarantine Bay, off the coast of Louisiana. The facilities were owned by certain working-interest owners. In August 2005, Hurricane Katrina severely damaged the facilities, throwing wreckage into the bays and causing oil to escape from the wells and from damaged equipment and pipes. Cox, complying with various federal statutes and regulations, spent millions of dollars cleaning up the oil contamination and removing wreckage from the bays. The working-interest owners provided the clean-up funds to Cox; in return, Cox agreed to repay the working-interest owners from any insurance recovery. Cox completed its clean-up work in September 2007.

At the time of the hurricane, Cox and the working-interest owners had two types of insurance relevant here. First, Cox had two insurance policies issued by St. Paul—a primary commercial general liability policy and an umbrella excess liability policy. The working-interest owners were additional insureds on these policies. The primary policy provided $1 million in coverage for "covered pollution clean-up costs that result from a sudden and accidental pollution incident." The excess policy provided an additional $20 million in

coverage for pollution clean-up costs that, as relevant here, "would have been covered by [the primary policy], but aren't only because its applicable limit of coverage is used up." Both policies defined "pollution clean-up costs" as follows:

> *Pollution clean-up costs* means any cost or expense that:
> - is for pollution work; and
> - is reported to us within one year of the ending date of that pollution work.

In turn, the policies defined "pollution work" as:

> - the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing of any pollutant; or
> - the responding to, or assessing, in any way the effects of any pollutant.

Second, the working-interest owners had property-insurance policies on the Eloi Bay and Quarantine Bay facilities. These policies were issued by other insurers and, in the aggregate, provided $5 million of coverage for removal of wreckage and debris (ROWD).

On October 17, 2005, Cox notified St. Paul that it had a pollution clean-up claim. On October 27, St. Paul hired Shuman Consulting Services, L.P., to adjust the claim, and a Shuman representative made preliminary contacts with Cox's representative to discuss it. Between November 8, 2005, and March 13, 2006, however, no St. Paul or Shuman representative communicated with any Cox representative to investigate the claim. Additionally, no St. Paul or Shuman representative requested any invoices or other documents to substantiate the claim until July 24, 2006.

In the year following St. Paul's request for documents, Cox submitted various invoices and statements of the amount of its claim. St. Paul paid $1,480,395 of the claim (the policy limit of $1 million under the primary policy and $480,395 under the excess policy). On August 30, 2007, however, St. Paul delivered a letter to Cox acknowledging that "Cox's claim submissions to date

3

exceed $15,000,000 and Cox continues to submit additional expenses," and stating that St. Paul believed that it had "paid all amounts that . . . are owed under the 'Pollution Clean Up Costs' section of the Policy." The letter also included a copy of a complaint that St. Paul had filed in this case against Cox seeking a declaration that St. Paul was not liable for the rest of Cox's claim.

Cox counterclaimed on behalf of itself and the working-interest owners, alleging that St. Paul had breached the policy; that St. Paul had done so in bad faith; and that, because St. Paul had failed to commence an investigation or request documents within 30 days of receiving notice of its claim, St. Paul owed penalty interest under the Texas Prompt Payment of Claims Act. In support of the counterclaim, a Cox employee, Tim Morrison, summarized and compiled all pollution clean-up costs that Cox had incurred, along with the relevant invoices. Cox submitted the bulk of this information to St. Paul in February 2011, with additional costs and invoices before trial. These costs amounted to $10,945,498.62, which, subtracting the amount that St. Paul had already paid ($1,480,395), was a total claim at trial of $9,465,103.62. Before trial in the St. Paul proceeding, the ROWD insurers paid the working-interest owners the aggregate debris-removal policy limit—$5 million.

At trial, the jury found that St. Paul had breached the excess policy, resulting in $9,465,103.22 in damages to Cox. Furthermore, the jury found that St. Paul had received notice of Cox's claim on October 17, 2005, but had not, within 30 days of that date, "commence[d] an investigation of Cox['s] claim" or "request[ed] from Cox . . . all items, statements, and forms that St. Paul reasonably believed, at that time, would be required from Cox." Accordingly, St. Paul had violated § 542.055(a) of the Act.

The district court entered judgment on the jury's findings, awarding Cox $9,465,103.22 in damages for breach of the policy, $13,064,948.28 in penalty interest under the Act, $2,864,167.31 in prejudgment interest, and costs and

No. 13-20529

reasonable attorney's fees.  St. Paul moved for judgment as a matter of law. The district court denied the motion and entered judgment.  St. Paul filed this appeal.

## II.

"We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard[] as the district court." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013).  "Under that standard, a litigant cannot obtain judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (en banc) (internal quotation marks omitted).

## III.

St. Paul argues that the district court erroneously awarded to Cox (1) over $2 million of costs that Cox failed to report, in noncompliance with the excess policy's one-year reporting requirement; (2) over $2 million of costs that had already been reimbursed by other insurers; and (3) millions of dollars in excess penalty interest under the Texas Prompt Payment of Claims Act.  We consider each argument in turn.

## A.

St. Paul first argues that the district court erroneously awarded $2,089,610 of pollution clean-up costs that Cox failed timely to report to St. Paul, in accordance with the excess policy's one-year reporting requirement. The district court held that this amount was properly included in the judgment because the reporting requirement was merely a "condition precedent to coverage," which St. Paul waived when it denied Cox's claim on August 30, 2007.  In St. Paul's view, however, the reporting requirement is not a condition precedent but instead is "included in the policy's definition of the scope of

5

covered costs," such that, under Texas law, it cannot be waived. *See, e.g., Minn. Mut. Life Ins. Co. v. Morse*, 487 S.W.2d 317, 320 (Tex. 1972) ("[W]aiver and estoppel cannot enlarge the risks covered by a policy . . . .").

1.

In Texas, a condition precedent to insurance coverage—i.e., a provision in an insurance policy that "avoid[s] coverage *unless* an insured does something," *see PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 635 (Tex. 2008)—is waived if the insurer denies liability within that time period allowed under the policy for the insured to comply with the condition. *Sanders v. Aetna Life Ins. Co.*, 205 S.W.2d 43, 44–45 (Tex. 1947); *see also, e.g., N. River Ins. Co. v. Pomerantz*, 492 S.W.2d 312, 313 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) ("A denial of liability by the insurance company within the period allowed for filing proof of loss, on grounds other than the failure to submit proof of loss, constitutes a waiver of this requirement."). "[C]ompliance with a notice provision in an insurance policy," like the reporting requirement at issue here, "has often been characterized as a condition precedent to coverage." *Coastal Ref. & Mktg. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 284–85 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also, e.g., Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173–74 (Tex. 1995). Nonetheless, although notice provisions have "often" been characterized as conditions precedent, they have not *invariably* been so characterized, as our decision in *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653 (5th Cir. 1999), demonstrates.

At issue in *Matador* was a policy provision defining a "covered pollution incident" as a "discharge, dispersal, release, or escape of pollutants that," among other things, "[i]s reported to the company within 30 days of its beginning." 174 F.3d at 655–56. When the insured, Matador, failed to report a pollution incident within the 30-day period, St. Paul denied its claim. *Id.* at

656. On appeal, Matador argued that, because the notice provision was a mere "condition precedent to performance," St. Paul waived it by accepting deductibles relating to the pollution incident after becoming aware of the late notice. This court disagreed, however, reasoning that the notice provision defined "the risks covered under the insurance policy," such that, to "hold[] that coverage exists, despite Matador's untimely notice, would materially change the scope of coverage, would be contrary to the plain language of the insurance policy, and would circumvent the objective intent of the parties to the contract." *Id.* at 661 (internal quotation marks omitted). Accordingly, we held that, under Texas law, the notice provision could not be waived. *Id.*

Relying on *Matador*, St. Paul emphasizes that the one-year reporting requirement here appears in the excess policy's definition of covered "pollution clean-up costs." *See supra* p. 3. Thus, reading *Matador* to stand for a bright-line rule that a notice provision appearing in a policy's "insuring language" defines the scope of coverage and is therefore nonwaivable, St. Paul contends that Cox's compliance with the one-year reporting requirement could not be waived.

We think that St. Paul reads *Matador* too broadly. We stressed in *Matador* that the parties' "objective intent"—and not just the location of the notice provision in the policy—determined whether the provision could be waived. 174 F.3d at 661 (internal quotation marks omitted); *see also id.* at 656 ("When interpreting a contract, our primary concern is to ascertain and to give effect to the intentions of the parties as expressed in the instrument." (internal quotation marks omitted)). And indeed, *had Matador*'s rationale focused solely on the notice provision's location in the policy, its holding would have been inconsistent with Texas law. *See Criswell v. European Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990) ("In order to determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can

No. 13-20529

be done only by looking at the entire contract."); *see also, e.g., SLT Dealer Grp., Ltd. v. Americredit Fin. Servs.*, 336 S.W.3d 822, 830 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding that "[i]rrespective of the section subtitle 'Condition Precedent,'" a provision was "not a condition"). Thus, although we grant that the one-year reporting requirement's placement in the policy's definition of covered "pollution clean-up costs" is *relevant*, the *dispositive* question is whether, "consider[ing] the contract as a whole," the parties "objective[ly] inten[ded]" for that requirement to be a nonwaivable part of the definition of the scope of coverage. *Matador*, 174 F.3d at 656, 661 (internal quotation marks omitted).

2.

For several reasons, we conclude that the parties here did not so intend.

First, St. Paul's argument that the requirement here materially assists in defining the scope of coverage, and therefore is not a condition precedent, is inconsistent with the excess policy "as a whole." *Id.* at 656. As St. Paul emphasizes, the policy in one provision (called "What This Agreement Covers") seems to treat the reporting requirement as definitional, providing that "[p]ollution clean-up costs *means* any cost or expense that . . . is for pollution work; *and is reported to [St. Paul] within one year of the ending date of that pollution work*" (emphasis added). Yet in a later provision (called "When This Agreement Covers"), the policy again sets out the reporting requirement, but this time in conditional terms:

> Pollution clean-up costs liability. We'll apply this agreement to claims or suits for covered pollution clean-up costs only when such costs are reported to us within one year of the ending date of the pollution work.

To give effect to the former as a definitional iteration of the reporting requirement would render the latter, conditional iteration of the reporting requirement meaningless: it makes no sense to say that the policy applies to

8

pollution clean-up costs "only when such costs are reported . . . within one year" if costs have to be reported within one year to actually constitute "pollution clean-up costs" at all. *See, e.g., De Laurentis v. United Servs. Auto. Ass'n*, 162 S.W.3d 714, 721 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("We must give effect to all contractual provisions so that none will be rendered meaningless."). Thus, the policy, viewed "as a whole," is at least ambiguous as to whether the reporting requirement is actually a nonwaivable part of the definition of the scope of coverage or whether it is intended to be read as a waivable condition precedent—and "ambiguities in an insurance contract" must be resolved "against the insurer and in favor of coverage." *Matador*, 174 F.3d at 657.

Second, unlike in *Matador*, the one-year reporting requirement is a *cost*-reporting requirement, not an *incident*-reporting requirement. The specific nature of the requirement was important in *Matador*, because *Matador*'s reasoning rested in part on the distinction between "claims-made" policies, under which notice provisions are "strictly interpret[ed]," and "occurrence" policies, in which they are not. *Id.* at 658–61. Because the notice provision in *Matador* defined covered incidents as only those that are reported within 30 days of the incident's beginning, the provision—like a notice provision in a claims-made policy—served to cut off the insurer's prospective liability at a definite date. *Id.* at 659–60; *see Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 378–79 (Tex. 2009) ("[T]he main difference between ['claims-made' and 'occurrence'] policies is that a 'claims-made' policy provides unlimited retroactive coverage and no prospective coverage, while an 'occurrence' policy provides unlimited prospective coverage and no retroactive coverage."). Thus, the *Matador* court concluded that "[t]he nature of St. Paul's and Matador's bargain . . . resembles the nature of the bargain underlying a

'claims-made' policy," so strict enforcement of the notice provision was appropriate. 174 F.3d at 659.

Here, by contrast, the one-year reporting requirement does not restrict St. Paul's liability to an immediately ascertainable time frame. Instead, it requires only that Cox report its pollution clean-up costs within one year "of the ending date of that pollution work"—and as this case illustrates, pollution clean-up work can drag on for years. Accordingly, the cost-reporting requirement here, unlike the incident-reporting requirement at issue in *Matador*, does not necessarily demand the "strict[] interpret[ation]" afforded to notice provisions in claims-made policies. *Id.*

Finally, only at the edges of imagination would one conclude that the parties could have intended the one-year reporting requirement to be nonwaivable, given the consequences that would result. For instance, here, the district court found that St. Paul waived the reporting requirement when, while Cox's pollution clean-up work was ongoing, it sent Cox the August 30, 2007 letter denying Cox's claim and enclosing a copy of its declaratory-judgment complaint. But according to St. Paul, this denial letter could not have waived the reporting requirement. Thus, in St. Paul's view, Cox was required to continue reporting its pollution clean-up costs to St. Paul, even though St. Paul had already stated that it believed it had "paid all amounts that . . . are owed under" the policy—and indeed, even though St. Paul had already instituted this lawsuit. Particularly in the light of the other infirmities in St. Paul's view of the reporting requirement, we cannot conclude that the parties intended such a counterintuitive result. *See, e.g., Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) ("Courts will avoid when possible and proper a construction which is unreasonable . . . .").

\*    \*    \*

10

No. 13-20529

Although insurers are, of course, as free to bargain for nonwaivable cost-reporting requirements as they are to bargain for nonwaivable incident-reporting requirements, *see Matador*, 174 F.3d at 659–61, we agree with the district court that neither St. Paul nor Cox bargained for such a requirement here.   Thus, since there is no dispute that, if the one-year reporting requirement were indeed a waivable condition precedent, the district court correctly held that St. Paul's denial of Cox's claim constituted a waiver, we reject St. Paul's argument that the judgment must be reduced by any costs not reported in compliance with the requirement.

B.

St. Paul further argues that the district court erred by awarding damages for costs that already had been reimbursed by the ROWD (removal-of-wreckage-and-debris) insurers.

1.

Because Cox's post-hurricane clean-up efforts required it to both clean up oil contamination and remove wreckage that was strewn into the bays, its efforts gave rise to claims under both the pollution coverage issued by St. Paul and the ROWD coverage issued by other insurers.   Some of these efforts apparently resulted in costs that arguably could be characterized as either pollution clean-up costs or ROWD costs.

By February 2007, Cox had submitted more than $10 million worth of invoices to the ROWD insurers.   The adjuster for the ROWD claims, Paul Foreman, approved $5,425,943 worth of these invoices as being for ROWD costs.   The aggregate limit of the ROWD policies was $5 million, however, so the ROWD insurers paid the working-interest owners only that amount.

At trial, the jury found that the award of $9,465,103.22 against St. Paul represented an amount "over and above" that which Cox had already recovered.   Disagreeing, St. Paul argued in its motion for judgment as a matter

of law, and repeats on appeal, that at least $2,179,580.27 of the damages awarded against it were for costs that were submitted to the ROWD insurers as ROWD costs and were included in the $5 million settlement from the ROWD insurers.  Citing *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 775 (Tex. 2007), for the proposition that, under Texas insurance law's "principle of indemnity," "an insured may not recover more than once for the same loss," St. Paul therefore asserts that we must reduce the damages award by that amount.  For its part, Cox does not dispute that Texas law prohibits an insured from recovering the same loss from more than one insurer.  Instead, pointing to the jury's finding that the damage award involved no double recovery, Cox argues that St. Paul has insufficiently demonstrated that this finding should be displaced.

2.

We conclude that Cox has the better of this argument.  To succeed in displacing the jury's no-double-recovery finding as a matter of law, St. Paul must show that "the facts and inferences point so strongly and overwhelmingly in [its] favor that reasonable jurors could not reach a contrary conclusion." *Boh Bros.*, 731 F.3d at 451 (internal quotation marks omitted).  But as the district court correctly observed, the double-recovery evidence here is, "[a]t best, conflicting," and therefore does "not show, as a matter of law, that Cox was (or will be) compensated twice for the same claimed expenses."

Specifically, St. Paul's double-recovery evidence consists of the testimony of, and exhibits prepared by, its expert Cliff Smith.  Smith compared the invoices that were approved by the ROWD insurers with those that constituted Cox's final claim submission to St. Paul—the one prepared by Tim Morrison and on which the jury based its damages award at trial, *see supra* p. 4.  This comparison revealed that the ROWD insurers had approved as ROWD costs $2,605,523.27 worth of invoices that were also included in Cox's final claim

submission to St. Paul.  Smith then subtracted from this figure the entire amount of costs that the ROWD insurers had approved in excess of the aggregate ROWD policy limits—$425,943.  The resulting figure of $2,179,580.27 represents, St. Paul says, the "*minimum* overlap between the specific costs for which Cox had been reimbursed under the ROWD claim and Cox's claim at trial" (some emphasis omitted).

Cox's evidence, however, calls into question the appropriateness of Smith's methodology.  According to Cox, *approved* ROWD costs cannot be used to represent the costs the ROWD insurers ultimately *paid*.  This is so, Cox explains, because the adjuster for the ROWD claims, Foreman, did not conclusively *dis*approve of the remainder of the $10 million worth of invoices that Cox submitted to the ROWD insurers in excess of those that he approved.  Instead, Foreman testified that, once he had approved more costs than could be paid under the ROWD policy limits, there was no need to evaluate any further, and the ROWD insurers simply reimbursed $5 million of randomly selected costs.  Furthermore, Foreman stated that he believed that Cox was still incurring ROWD costs at the time he approved payment of the policy limits.  Thus, because, as Foreman testified, "there[ was] no allocation whatsoever" among submitted ROWD invoices, Cox argues that it is impossible to identify *any* of the costs reimbursed by the ROWD insurers as being the same as those awarded by the district court against St. Paul.

Viewing Foreman's testimony, as we must, "in the light most favorable to the verdict," *Boh Bros.*, 731 F.3d at 452, a jury reasonably could have concluded that none of the $9,465,103.22 damages award necessarily represented costs that Cox already had recovered from the ROWD insurers.  Accordingly, the district court correctly rejected St. Paul's argument that Cox doubly recovered as a matter of law.

No. 13-20529

C.

Finally, St. Paul challenges the district court's award of over $13 million in penalty interest under the Texas Prompt Payment of Claims Act, asserting that the district court incorrectly determined the date on which penalty begins to accrue under that statute.

1.

In order "to promote the prompt payment of insurance claims," *see* Tex. Ins. Code § 542.054, the Act provides for a series of deadlines to which insurers must adhere at each stage of the claims-handling process. First, § 542.055 provides:

> (a) Not later than . . . the 30th business day after the date an insurer receives notice of a claim, the insurer shall:
> (1) acknowledge receipt of the claim;
> (2) commence any investigation of the claim; and
> (3) request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant.

§ 542.055(a).[1] Next, § 542.056 requires "an insurer [to] notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss." § 542.056(a). Then, if the insurer notified the claimant under § 542.056 that it was accepting the claim, § 542.057 provides that "the insurer shall pay the claim not later than the fifth business day after the date notice is made." § 542.057(a). Finally, § 542.058 provides an alternate payment deadline to the one set out in § 542.057: "if an insurer, after receiving all items, statements, and forms reasonably requested and required under Section 542.055, delays payment of the claim for . . . more

---

[1] Generally, § 542.055's deadline is limited to 15 days, but it extends to the 30 days referenced here "if the insurer is an eligible surplus lines insurer." § 542.055(a). No party disputes that St. Paul qualifies for the 30-day deadline.

14

No. 13-20529

than 60 days, the insurer shall pay damages and other items as provided by Section 542.060." § 542.058(a).

As referenced in § 542.058, § 542.060 provides the enforcement mechanism for the Act's deadlines. Under that provision,

> [i]f an insurer that is liable for a claim under an insurance policy is not in compliance with this subchapter, the insurer is liable to pay . . . , in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages, together with reasonable attorney's fees.

§ 542.060(a).

Here, the jury found that Cox provided notice of its claim to St. Paul on October 17, 2005, and that St. Paul failed to commence an investigation or request from Cox needed items, statements, and forms within 30 days of that date. Consequently, the jury found that St. Paul violated § 542.055 of the Act. The district court held that this violation triggered the 18% interest penalty set out in § 542.060. As for the precise date that interest began accruing, the district court reasoned that when St. Paul violated § 542.055 by failing to timely request information, it "signal[led]" to Cox that notice of the claim was all the information it believed to be required. Thus, the district court concluded that interest began accruing 60 days after Cox provided St. Paul with notice of its claim, on December 16, 2007. *See* § 542.058(a).[2]

---

[2] The district court determined that interest *stopped* accruing the date it rendered judgment in favor of Cox, August 16, 2013. Penalty interest under the Act accrues until the earlier of (1) the date judgment is rendered in favor of the insured, *see, e.g., Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc.*, 612 F.3d 800, 809 (5th Cir. 2010); or (2) the date the insurer takes the action it failed to take earlier, triggering the penalty. *See State Farm Life Ins. Co. v. Martinez*, 216 S.W.3d 799, 806–07 (Tex. 2007) (holding that the insurer's interpleader of policy proceeds, which "suffced in place of payment," "[h]alt[ed]" the accrual of penalty interest after the insurer violated § 542.058(a)); *see also Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 263–64 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.) (similar). St. Paul raises no argument that the district court erred in determining the date interest stopped accruing, and "arguments not raised . . . are waived." *Meadaa v. K.A.P. Enters., L.L.C.*, 756 F.3d 875, 883 n.21 (5th Cir. 2014). Consequently, we have no occasion to

No. 13-20529

St. Paul disputes the district court's determination only of the accrual date. As St. Paul points out, it is only § 542.058, and not any of the Act's other deadlines, that explicitly provides that an insurer is liable for penalty interest under § 542.060 for violating it. *See* § 542.058(a) ("[I]f an insurer, after receiving all items, statements, and forms reasonably requested and required under Section 542.055, delays payment of the claim for . . . more than 60 days, the insurer shall pay damages and other items as provided by Section 542.060.") Given this statutory provision, and given that the Act's ultimate purpose is "to promote the prompt *payment* of insurance claims," *see* Tex. Ins. Code § 542.054 (emphasis added), St. Paul reasons that its violation of § 542.055 is immaterial to the proper calculation of the accrual date. Instead, St. Paul argues that interest should not begin to accrue until 60 days after the insurer "receive[s] sufficient information with which it could adjust the claim."[3] And that date, St. Paul adds, should be determined on an invoice-by-invoice basis (i.e., interest should accrue as to a particular cost 60 days after St. Paul received the invoice supporting that cost); or, alternatively, based on the date St. Paul received *all* information necessary to adjust Cox's *entire* claim.

2.

The Texas Supreme Court has not yet explained whether, and when, an insurer's violation of § 542.055 triggers the accrual of penalty interest under § 542.060. We therefore must make an "*Erie* guess[,] determin[ing], in our best

---

address whether St. Paul "cured" its deadline violation so as to stop the accrual of interest sometime before the date of judgment.

[3] It is not immediately obvious how St. Paul gets from its premise—that § 542.058 is the only deadline in the Act that triggers the accrual of statutory interest—to its conclusion that interest should not accrue until the insurer fails to pay a claim within 60 days of receiving "sufficient information with which it could adjust the claim." *See* § 542.058(a) (requiring insurers to pay claims within 60 days of "receiving all items, statements, and forms *reasonably requested and required under Section 542.055*" (emphasis added)). Because we disagree that § 542.058 is the only deadline in the Act that triggers statutory interest, however, *see infra* pp. 17–19, this ostensible flaw in St. Paul's argument is beside the point.

judgment, how that court would resolve the issue." *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009) (internal quotation marks omitted). In doing so, we will "follow the same rules of [statutory] construction that a Texas court would apply—and under Texas law the starting point of our analysis is the plain language of the statute." *Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007). In our view, the plain language of the Act is fatal to St. Paul's argument.

As we have said, St. Paul's argument essentially is that the failure to comply with only one of the several statutory deadlines—the 60-day payment deadline under § 542.058—triggers the accrual of interest under § 542.060. But § 542.060 explicitly provides that an insurer who violates *any* of the deadlines in the Act is liable for the interest penalty on the amount of the claim. *See* Tex. Ins. Code § 542.060(a) ("If an insurer that is liable for a claim under an insurance policy *is not in compliance with this subchapter* . . . ." (emphasis added)). Unsurprisingly, given the plain language of § 542.060, St. Paul identifies no cases endorsing its theory that only a violation of the § 542.058 deadline gives rise to penalty interest. And indeed, courts have repeatedly stated otherwise—that "[t]he language of [§ 542.060] clearly and unambiguously dictates its application to the insurer that fails to comply with *any* of the requirements set forth in [the Act]." *Mid-Century Ins. Co. v. Barclay*, 880 S.W.2d 807, 811–12 (Tex. App.—Austin 1994, writ denied); *see also Lexington Ins. Co. v. N. Am. Interpipe, Inc.*, No. H-08-3589, 2011 U.S. Dist. LEXIS 5090, at *13 n.18 (S.D. Tex. 2011); *U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 222 (Tex. App.—San Antonio 2012, pet. denied); *Protective Life Ins. Co. v. Russell*, 119 S.W.3d 274, 286 (Tex. App.—Tyler 2003, pet. denied).

To be sure, it is a "disturbing inconsistency" that, of the Act's deadlines, "only [§] 542.058 includes express language tying a violation of its prompt payment requirement to statutory interest under [§] 542.060(a)." *Devonshire*

No. 13-20529

*Real Estate & Asset Mgmt., LP v. Am. Ins. Co.*, CIVIL ACTION NO. 3:12-CV-2199-B, 2014 U.S. Dist. LEXIS 135939, at *59–60 (N.D. Tex. Sept. 26, 2014). But to conclude from this particular phrase that only a violation of § 542.058 gives rise to penalty interest under § 542.060 would "take[] th[e] *expressio unius est exclusio alterius* canon too far." *Elonis v. United States*, 135 S. Ct. 2001, 2008 (2015); *see Mid-Century Ins. Co. v. Kidd*, 997 S.W.2d 265, 274 (Tex. 1999) ("The doctrine of *expressio unius est exclusio alterius* is . . . not an absolute rule."). First, as we have explained, the argument that no deadline other than § 542.058 triggers penalty interest under § 542.060 is foreclosed by the text of § 542.060 itself, which penalizes insurers "not in compliance *with this subchapter*," not just those not in compliance with § 542.058. § 542.060(a) (emphasis added). Moreover, a reading of the Act under which insurers are liable for penalty interest only if they violate § 542.058, but not if they violate the other statutory deadlines, would "effectively . . . render[]" the other deadlines "toothless," *Devonshire,* 2014 U.S. Dist. LEXIS 135939, at *61, thus flouting the "elementary rule of construction" that "effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered . . . inoperative." *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2002) (internal quotation marks omitted). Finally, § 542.054 provides that the Act "shall be liberally construed to promote the prompt payment of insurance claims." Yet the construction urged by St. Paul is hardly "liberal"; instead, it would seem to transform all but one of the Act's deadlines from commands backed by the threat of penalty interest to suggestions backed by nothing at all.

Notwithstanding § 542.058's specific reference to penalty interest, then, we think the text of the Act as a whole is clear: a violation of any of the Act's deadlines—including St. Paul's violation of § 542.055 here—triggers the accrual of statutory interest under § 542.060.

18

No. 13-20529

3.

Aside from its statutory argument, St. Paul also asserts that the Texas Supreme Court's decision in *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1 (Tex. 2007), casts doubt on the district court's interest calculation. In *Lamar Homes*, this court certified to the Texas Supreme Court the question whether the Act applies to an insurer's breach of the duty to defend. *Id.* at 4. In answering yes, the *Lamar Homes* court disapproved of lower-court decisions that had "characterized the prompt-payment statute as 'unworkable' in the context of the insured's claim under a defense benefit" because "a defense claim . . . typically has no finite value at the time the insurer denies it." *Id.* at 19. Concluding that the Act presents no special difficulty with regard to a claim for defense benefits, the court explained that the actual loss suffered by the insured is quantified when the insured retains counsel and receives "statements for legal services." *Id.* The court explained that "when the insurer, who owes a defense to its insured, fails to pay within the statutory deadline, the insured matures its right to reasonable attorney's fees and the eighteen percent interest rate specified by the statute." *Id.* (citing § 542.060).

Latching onto the *Lamar Homes* court's reference to "the last piece of information needed to put a value on the insured's loss," St. Paul asserts that *Lamar Homes* articulated an "accrual rule" under which interest under the Act does not accrue on particular costs at least until the insured submits the invoices supporting the costs and the insurer then fails to pay within the statutory deadline. Taken in context, however, the *Lamar Homes* court's reference to "the last piece of information needed to put a value on the insured's loss" was in reference to a distinct type of claim that "has no finite value at the time the insurer denies it," not a broad holding that, contrary to the statutory text, an insurer is liable for penalty interest *only* if it fails to pay after receiving the information needed to adjust the claim. *Id.* In fact, the court's description

of how interest would accrue when an insurer fails to pay a defense-benefit claim within the § 542.058 deadline presupposes that the insurer met the deadlines imposed by the other sections of the statute. *Id.* (hypothesizing that the insurer "wrongfully rejects its defense obligation"). And indeed, reading *Lamar Homes* to say that only an insurer's failure to *pay* can trigger penalty-interest liability is inconsistent with the language of the opinion itself, which elsewhere states explicitly that "[t]he prompt-payment statute provides that an insurer . . . who does not promptly *respond to*, or pay, the claim as the statute requires, is liable" for statutory interest. *Id.* at 16 (emphasis added). Thus, *Lamar Homes* provides no support for St. Paul's proposed accrual rule.

\*    \*    \*

In sum, the Texas Prompt Payment of Claims Act (1) imposes on insurers a series of claims-handling deadlines, §§ 542.055–.058; and (2) enforces those deadlines by requiring insurers who fail to comply with them (and who ultimately are liable on the claim) to pay statutory interest. § 542.060(a). One of the Act's deadlines is set out in § 542.055(a), which requires an insurer, among other things, to commence an investigation within 30 days of receiving notice of an insured's claim. The question presented in this appeal is whether an insurer who admittedly fails to comply with § 542.055(a) may incur penalty interest under § 542.060; or whether, as St. Paul has argued, regardless of an insurer's noncompliance with the § 542.055(a) deadline, penalty interest under the Act will accrue only when an insurer fails to pay a claim within 60 days of receiving sufficient information upon which it could adjust the claim.

As we have explained, the plain language of the Act provides that a violation of *any* of the Act's deadlines—including St. Paul's violation of the § 542.055(a) deadline here—begins the accrual of statutory interest under § 542.060. Thus, we cannot accept St. Paul's argument that, notwithstanding an insurer's violation of § 542.055(a), interest cannot begin to accrue until 60

No. 13-20529

days after the insurer receives sufficient information which would allow the insurer to adjust the claim.  Because this argument is the only argument that either party has raised against the district court's determination of the interest-accrual period, we find no reversible error in the district court's award of penalty interest to Cox.[4]

### IV.

For these reasons, the district court's judgment is, in all respects,

AFFIRMED.

---

[4] As we have noted, the district court did not begin the accrual of interest on the date of St. Paul's violation of § 542.055.  Instead, combining §§ 542.055 and 542.058, the district court held that interest began accruing 30 days later, i.e., 60 days after the notice of claim.  *See supra* p. 15.  Cox has not cross-appealed to seek accrual from the date of the § 542.055 violation, however.  Thus, although we have concluded that a violation of any of the Act's deadlines begins the accrual of statutory interest, we affirm the district court's application of a shorter accrual period here.