**Ralph S. JANVEY, in his capacity as Court Appointed Receiver for the Stanford International Bank LTD et al., Plaintiff–Appellee**

v.

**Peter ROMERO, Defendant–Appellant.**

No. 15–10435.

United States Court of Appeals, Fifth Circuit.

March 16, 2016.

Kevin M. Sadler, Baker Botts, L.L.P., Palo Alto, CA, Douglas J. Buncher, Neligan Foley, L.L.P., Timothy Stuart Durst, Esq., Baker Botts, L.L.P., Dallas, TX, Sherwin Faridifar, Scott Daniel Powers, Baker Botts, L.L.P., Austin, TX, for Plaintiff–Appellee.

Brian Wade Clark, Kane Russell Coleman & Logan, P.C., David Patrick Long, Squire Patton Boggs, L.L.P., Dallas, TX, for Defendant–Appellant.

Before BENAVIDES, DENNIS, and SOUTHWICK, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

This appeal involves another Stanford Ponzi scheme case. Plaintiff–Appellee Ralph S. Janvey, in his capacity as Court Appointed Receiver for the Stanford International Bank Ltd., et al. (the "Receiver"), brought a fraudulent transfer claim against Defendant–Appellant Peter Romero ("Romero"), a former international advisor to the Stanford entities. For the reasons below, we AFFIRM.

## I. BACKGROUND

Because the Stanford Ponzi scheme has been the subject of numerous appeals in this Court, this opinion only briefly recounts the facts relevant to this appeal. *See generally, e.g., Janvey v. Democratic Senatorial Campaign Comm., Inc. (DSCC)*, 712 F.3d 185, 188–89 (5th Cir. 2013). For almost twenty years, R. Allen Stanford ("Stanford") and his co-conspirators perpetrated a multi-billion dollar Ponzi scheme. The Ponzi scheme involved a network of numerous entities owned by Stanford (the "Stanford entities") that sold fraudulent certificates of deposit ("CDs") to investors.

After Romero retired from the United States Department of State in 2001, he began working part-time as a member of the Stanford International Advisory Board (the "IAB"). Although the nature of Romero's job functions are disputed, there is evidence to support that his job essentially was to market the Stanford brand internationally. He worked on the IAB for almost eight years, resigning in January 2009. He received $700,000 as advisory board fees for his work on the IAB,

distributed in periodic installments over the span of these eight years, plus travel expense reimbursement and payments on his own Stanford CDs.

On February 16, 2009, the Securities and Exchange Commission filed a lawsuit against Stanford, Stanford's Chief Financial Officer James M. Davis ("Davis"), various other individuals, and various Stanford entities. That same day, the court appointed Ralph S. Janvey to be the Receiver for those defendants. On August 27, 2009, Davis pled guilty to criminal charges. In October 2010, the Receiver began investigating payments made to the members of the IAB, including Romero. On February 15, 2011, which was approximately four and a half months after the Receiver began investigating the IAB, the Receiver filed the underlying lawsuit against Romero.

In the underlying lawsuit, the Receiver sought to recover the monies paid by the Stanford entities to Romero under a fraudulent transfer claim or, alternatively, an unjust enrichment claim. After a four-day jury trial in February 2015, the jury found in favor of the Receiver on both the fraudulent transfer and unjust enrichment claims. Romero then filed a motion for judgment as a matter of law, alleging that a portion of the fraudulent transfer claim is barred by the statute of repose and that unjust enrichment is not an independent cause of action.[1] The district court denied Romero's motion and entered a final judgment awarding the Receiver $788,655.01 in damages under the fraudulent transfer claim only; no damages were awarded under the alternative unjust enrichment claim. Romero now appeals the district court's denial of his post-verdict motion for judgment as a matter of law. Additionally, Romero requests abatement of this appeal pending a ruling by the Texas Su-preme Court on a question certified to it by this Court in a different appeal regarding the reasonably-equivalent-value defense to a fraudulent transfer claim.

## II. STANDARD OF REVIEW

 "We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir.2013). "Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Id.* (quoting FED.R.CIV.P. 50(a)). "Under that standard, a litigant cannot obtain judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Cox Operating, L.L.C. v. St. Paul Surplus Lines Ins. Co.*, 795 F.3d 496, 500 (5th Cir.2015). We must review "all of the evidence in the record." *Carroll v. Ellington*, 800 F.3d 154, 168 (5th Cir.2015). "We credit the non-moving party's evidence and disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* "After a jury trial, [the] standard of review is especially deferential." *Abraham*, 708 F.3d at 620 (alteration in original).

## III. ANALYSIS

### A. Fraudulent Transfer

Romero appeals the district court's denial of his post-verdict motion for judgment as a matter of law, contending, inter alia, that a portion of the Receiver's fraudulent transfer claim is barred by the statute of repose. On this issue, the district court's

---

1. Romero asserted one additional claim, but he has not appealed on that basis.

charge and jury's verdict provided as follows:

*QUESTION NO. 2:*

Did the plaintiff timely file his [fraudulent transfer] claim? Answer "yes" or "no":

*YES*

*INSTRUCTIONS FOR QUESTION NO. 2:*

The plaintiff timely filed his claim if the plaintiff did not discover and could not reasonably have discovered the transfers to Romero and their fraudulent nature until after February 15, 2010.

The district court denied the motion for judgment as a matter of law, holding that "the Receiver presented sufficient evidence from which the jury could conclude that despite diligence, the Receiver did not and could not have reasonably discovered his [fraudulent transfer] claims until after February 15, 2010." On appeal, Romero does not dispute the accuracy of the wording of the jury charge. Rather, Romero disputes the sufficiency of the evidence supporting the jury's finding.

The Receiver brought his fraudulent transfer claim under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). TUFTA provides the following statute of repose, in relevant part:

[A] cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought ... within four years after the transfer was made or the obligation was incurred or, if later, **within one year after the transfer or obligation was or could reasonably have been discovered by the claimant.** ...

TEX. BUS. & COM.CODE § 24.010(a)(1) (emphasis added); *Nathan v. Whittington,* 408 S.W.3d 870, 874 (Tex.2013). With respect to TUFTA's one-year repose period, this Court has held that "a fraudulent-conveyance claim does not accrue until the claimant knew or reasonably could have known **both** of the transfer **and** that it was fraudulent in nature." *DSCC,* 712 F.3d at 193 (emphasis added).

█ The Receiver filed his fraudulent transfer claim against Romero on February 15, 2011. Romero does not dispute that claims for transfers made to him on or after February 15, 2007, are not barred by the statute of repose because they fall within the four-year repose period. The parties' dispute is whether claims for transfers made to Romero prior to February 15, 2007, fall within the one-year repose period.[2] Specifically, they dispute the knowledge-of-transfer accrual requirement of the one-year repose period, not the fraudulent-nature accrual requirement—that is, whether the Receiver filed the fraudulent transfer claim within one year after he discovered or could reasonably have discovered the transfers to Romero.[3]

---

2. Romero claims that the damages awarded to the Receiver should be reduced to $190,568.16, which is the total amount of the transfers made to Romero after February 15, 2007.

3. Unlike the Receiver's contentions in two other Stanford Ponzi scheme appeals involving TUFTA's statute of repose, here the Receiver does not contend that he filed the fraudulent transfer claim within one year after he discovered or could reasonably have discovered the **fraudulent nature** of the transfers. *Cf. Janvey v. Brown,* 767 F.3d 430, 437–38 (5th Cir.2014); *DSCC,* 712 F.3d at 193–98. The Receiver probably does not assert such contention because the Receiver did not file his claim against Romero until almost a year and a half after Davis pled guilty to the Ponzi scheme, whereas in the other two appeals the Receiver filed his claims less than one year after Davis pled guilty. *Cf. DSCC,* 712 F.3d at 193, 196–98 (finding that the fraudulent-nature accrual requirement equated to when the

When a plaintiff discovered or could reasonably have discovered a transfer is generally a question of fact for the fact-finder. *DSCC*, 712 F.3d at 196; *Walker v. Anderson*, 232 S.W.3d 899, 909, 911 (Tex.App.—Dallas 2007, no pet.); *Duran v. Henderson*, 71 S.W.3d 833, 839 (Tex.App.—Texarkana 2002, pet. denied). "However, if reasonable minds could not differ about the conclusion to be drawn from the facts in the record, then the start of the [response] period may be determined as a matter of law." *DSCC*, 712 F.3d at 196; *Walker*, 232 S.W.3d at 909; *Duran*, 71 S.W.3d at 839. Whether the plaintiff exercised reasonable diligence to discover a fraudulent transfer is relevant to determining whether a plaintiff could reasonably have discovered a fraudulent transfer. *See Brown*, 767 F.3d at 438; *DSCC*, 712 F.3d at 194–95, 198; *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 315–17 (Tex.App.—Houston [1st Dist.] 2012, pet. denied); *Duran*, 71 S.W.3d at 839.[4]

The jury found that the Receiver "did not discover and could not reasonably have discovered the transfers to Romero and their fraudulent nature until after February 15, 2010." Romero contends that the Receiver could have discovered the transfers to Romero before February 15, 2010, if the Receiver had chosen to start investigating the IAB sooner, and that the Receiver's decision to not investigate the IAB until October 2010 should not toll the statute of repose. Specifically, Romero contends that the Receiver could have discovered the transfers within four and a half months of his appointment, which was on February 16, 2009, because the Receiver discovered the transfers at most four and a half months after he began to investigate the IAB. The Receiver claims that the

Receiver discovered or could reasonably have discovered the transfers had been made during the operation of a Ponzi scheme using proceeds of that scheme, and finding no evidence that the Receiver could reasonably have discovered Stanford was operating a Ponzi scheme before David pled guilty); *see also Brown*, 767 F.3d at 438 (citing *DSCC*, 712 F.3d at 193, 196–98, for the same proposition). Regardless, this Court does not need to resolve the fraudulent-nature accrual issue so long as Romero timely filed his claim under the knowledge-of-transfer accrual requirement.

4. Romero contends that an "inherently undiscoverable" analysis also applies and that the transfers were not inherently undiscoverable. However, such contention is misplaced. When the Texas legislature has not spoken on whether the common law discovery rule applies to certain types of injuries or claims, the judiciary undergoes an "inherently undiscoverable" analysis to determine whether to allow application of the common law discovery rule to that injury or claim. *See Target Strike, Inc. v. Marston & Marston, Inc.*, 524 Fed. Appx. 939, 944 (5th Cir.2013) (citing *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex.1998)); *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313–14 (Tex.2006). TUFTA's statute of repose is similar to the common law discovery rule. *DSCC*, 712 F.3d at 194; *Zenner*, 371 S.W.3d at 315; *Cadle Co. v. Wilson*, 136 S.W.3d 345, 350 (Tex.App.—Austin 2004, no pet.); *Duran*, 71 S.W.3d at 839. Because the legislature, through the enactment of TUFTA's statute of repose provision, has already determined a type of discovery rule applies to TUFTA claims, the "inherently undiscoverable" analysis is not required to be applied to TUFTA. *Cf. Brown*, 767 F.3d at 438 (not mentioning the term "inherently undiscoverable" when analyzing TUFTA's statute of repose); *DSCC*, 712 F.3d at 193–98 (same); *Zenner*, 371 S.W.3d at 315–17 (same); *Duran*, 71 S.W.3d at 839 (same). *But see Cadle*, 136 S.W.3d at 351 (stating that although the Texas "supreme court's discovery-rule analysis has focused on whether the discovery rule is available under the common law—whereas [in this TUFTA case], the discovery rule is explicitly available by statute—the court's 'inherently undiscoverable' analysis, which focuses on a plaintiff's exercise of due diligence, is relevant to the statutory issue here of when this transfer *could reasonably have been discovered*").

investigation into Romero was completed four and a half months after it began because the Receiver had already compiled and analyzed the Stanford entities' records and that, therefore, the jury was entitled to infer the Receiver's investigation would have taken much longer to complete if it had begun immediately upon appointment. The Receiver also claims that Romero's characterization of the statute of repose does not account for the size and complexity of the Receiver's duties under the Stanford receivership order and does not account for the word "reasonably" in the statute.[5]

At trial, the Receiver testified that it would not have been reasonable in the "early days" of the receivership to "start looking at the [IAB]" because of "six major categories of work" he had to do involving "hundreds of issues." He said the six categories of work, which took place during at least the first two years, were the following: (1) "taking over Stanford businesses," (2) "deciding what we had to wind down," (3) "dealing with the account freeze," (4) "making an analysis and exam- ination of who got money and whether we could bring some lawsuits to get it back," (5) "fight[ing] in other countries to get control of assets," and (6) "help[ing] the government make their case and help[ing] with their investigation against Stanford and some other defendants." The Receiver further testified that the work he was doing prior to investigating the IAB "was critical for the receivership" and per court order. The court order appointing him as receiver directed him to perform three pages and thirteen categories of specific duties, including locating and collecting all of the assets and records of the receivership, instituting proceedings to obtain judgment with respect to persons or entities who received assets traceable to the receivership, making necessary disbursements on behalf of the receivership, performing all acts necessary to preserve the value of the receivership, providing the government with the documentation it sought, and submitting reports to the court.

Notably, the Receiver testified that there was no central location or computer

---

**5.** In addition, Romero seems to contend that Stanford's or the Stanford entities' knowledge of the transfers can be imputed to the Receiver. However, this type of contention has already been asserted by defendants in two other Stanford fraudulent transfer appeals and rejected by this Court. *See Brown*, 767 F.3d at 438; *DSCC*, 712 F.3d at 190, 193. In those appeals, this Court held the following:

> [T]he knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations. Thus, once freed of his coercion by the court's appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties....
>
> ....
>
> ... We do not agree with the [defendants'] argument that because the Stanford corporations knew of both the [transfers] to the [defendants] and their fraudulent origins from the moment they were made, the time to recover the [transfers] began to run then and has now elapsed....
>
> ....
>
> ... Because the Stanford corporations were the robotic tools of Stanford's Ponzi scheme, knowledge of the fraud could not be imputed to them while they were under Stanford's coercion. Consequently, the [defendants] are not entitled to summary judgment or dismissal of this suit based on the theory that knowledge of the fraudulent transfers were imputed to the Stanford corporations so as to bar the Receiver from asserting their [TUFTA] claims....

*DSCC*, 712 F.3d at 190–93; *Brown*, 767 F.3d at 438 (quoting *DSCC*, 712 F.3d at 193). Accordingly, neither Stanford's nor the Stanford entities' knowledge of the transfers to Romero are imputed to the Receiver for purposes of beginning to run TUFTA's statute of repose.

server for corporate records, bank records, or employee emails. Instead, each office had its own set of files and computers, and there were different, separate, internal accounting systems for each Stanford entity. All of the records from the various offices around the world comprised approximately 15,000 boxes of physical records, which filled 360,000 cubic feet of warehouse space, and 60 terabytes of electronic data, which is the equivalent of 6 Libraries of Congress. Therefore, when analyzing who received money and why, forensic accountants had to analyze hundreds of thousands of transactions that spanned twenty years, numerous companies around the world, separate accounting systems, and thousands of people. The Receiver said that "[i]t took months and months of forensic accounting work to begin ... to understand[ ] who got paid what." As to Romero specifically, the Receiver testified that Romero's payments for his work on the IAB "came in from three or four companies spread over a number of years." Also, there were no central files for the IAB records, no formal records explaining the purpose of the IAB, no records containing a job description for the IAB members or Romero, no formal IAB meeting minutes, and no recorded evaluations of the IAB or its members. The Receiver said that only "[a]fter going through volumes of documents and records, [were they] able to discover who the board was and what they did."

In addition, $320 million out of Stanford's $380 million in remaining cash was located in foreign countries, and Antiguan liquidators were trying to take control of those foreign assets; therefore, the Receiver engaged in litigation with foreign liquidators and courts to try to keep domestic control of the foreign assets. The Receiver testified that "[i]n the first two years we were devoting hundreds of hours of time and resources trying to get control

of those resources." Further, the Receiver had to shut down all of the various Stanford entities located around the world, which employed 3,000 people. Also, the securities brokerage accounts of approximately 32,000 Stanford clients were frozen by court order, and the Receiver had to analyze all of those accounts to determine whether the funds in the accounts could be released to the clients. The Receiver testified that it "took almost all of 2009 [and] into 2010" to unfreeze all the accounts that did not contain any proceeds from improper activities. Additionally, the Receiver had to manage 60 lawsuits involving 1300 defendants.

The Receiver explained that he only had "so many resources" to allocate and that "when the time came where [he] could get some people to look at [the IAB transfer] issues in October of 2010, [he] did." When asked why he did not bring the case against Romero in 2009 or 2010, the Receiver responded that he "had six major priorities which took tremendous amount of time the first two years" and that he "had to allocate priorities with the resources [he] had." Four and a half months after he began to investigate the IAB, he filed suit against Romero.

Much of the Receiver's testimony was corroborated by the testimony of Karyl Van Tassel, an accountant hired by the Receiver to lead the forensic accounting. In just the first year of the receivership, up to 125 professionals from Van Tassel's firm worked on the receivership for a total of over 46,000 hours.

Considering the aforementioned evidence together with the entire record, we hold there was a legally sufficient evidentiary basis for the jury's finding that the Receiver did not discover and could not reasonably have discovered the transfers to Romero and their fraudulent nature un-

til after February 15, 2010, and that, therefore, the Receiver's fraudulent transfer claim was timely under TUFTA's statute of repose. Accordingly, the district court did not err in denying Romero's post-verdict motion for judgment as a matter of law as to the fraudulent transfer claim.

Because the damages awarded in the final judgment are entirely based on the fraudulent transfer claim and we find no error as to the fraudulent transfer claim, we do not reach the alternative issues raised by Romero regarding the unjust enrichment claim.

## B. Abatement

■■■ Romero requests this Court to abate this appeal pending a ruling by the Texas Supreme Court on a question certified to it by this Court in a different appeal regarding TUFTA's reasonably-equivalent-value defense. TUFTA provides an affirmative defense that has two elements: "(1) that [the transferee] took the transfer in good faith; and (2) that, in return for the transfer, [the transferee] gave the debtor something of 'reasonably equivalent value.'" *Janvey v. Golf Channel, Inc.*, 792 F.3d 539, 544 (5th Cir.2015) (citing TEX. BUS. & COM.CODE § 24.009(a)). On June 30, 2015, this Court in *Golf Channel* certified the following question to the Texas Supreme Court: "[W]hat showing of 'value' under TUFTA is sufficient for a transferee to prove the elements of the affirmative defense ...?" *Id.* at 547. The answer "turns on whether TUFTA measures 'reasonably equivalent value' from the perspective of creditors, or rather from the perspective of the general marketplace" and "whether market value is sufficient proof of reasonably equivalent value." *Id.* at 543, 547.

In this case, the jury found that Romero did not take the advisory board fees and expenses in good faith and for reasonably equivalent value after being instructed that "[v]alue is determined from the viewpoint of Stanford's creditors at the time of the transfer." Romero acknowledges that he "had no reason to object" to this jury instruction because, according to him, "such instructions were a correct statement of the law as it existed at the time." Nonetheless, he requests this appeal be abated because, according to him, "if the Supreme Court of Texas determines that proof of fair market value is sufficient to establish reasonably equivalent value, then the instructions provided by the trial court in Romero's case were insufficient/or improper and the resulting ruling should be overturned under the plain error standard."

Not only did Romero not object during trial to this specific language of the jury instruction, he did not request a jury finding on market value even though the parties presented conflicting evidence of market value at trial. Moreover, Romero did not brief the merits of the reasonably-equivalent-value defense on appeal—either under the current standard or the market value standard that he hopes the Texas Supreme Court adopts. For these reasons, we deny Romero's request to abate this appeal.

## IV. CONCLUSION

For the foregoing reasons, we DENY Romero's request to abate, and we AFFIRM the district court's denial of Romero's post-verdict motion for judgment as a matter of law.