# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-20442

United States Court of Appeals
Fifth Circuit

**FILED**
September 16, 2015

Lyle W. Cayce
Clerk

WEISER-BROWN OPERATING COMPANY,

Plaintiff - Appellee Cross-Appellant

v.

ST. PAUL SURPLUS LINES INSURANCE COMPANY,

Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINSON, and COSTA, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This case involves an insurance dispute between Plaintiff Weiser-Brown Operating Company ("Weiser-Brown") and Defendant St. Paul Surplus Lines Insurance Company ("St. Paul").  On September 7, 2012, after a four-day trial, a jury found that St. Paul breached its insurance contract with Weiser-Brown by failing to pay Weiser-Brown's insurance claim for costs associated with the "loss of control" of an oil well that Weiser-Brown operated in Lavaca County, Texas.  St. Paul was ordered to pay Weiser-Brown $2,290,457.03 in damages for its breach of contract.  After trial, the district court awarded $1,232,328.14 in penalty interest to Weiser-Brown under the Texas Prompt Payment of Claims Statute (the "Prompt-Payment Statute"), Texas Insurance Code

No. 13-20442

§§ 542.051-.061. The court concluded that St. Paul violated § 542.056 of the statute on November 21, 2009, when it failed to accept or reject Weiser-Brown's claim fifteen days after receiving certain requested information, and the court calculated interest accruing from the date of that violation. St. Paul timely appealed and contends that the district court erred in concluding that St. Paul violated the Prompt-Payment Statute and, alternatively, that the district court used the wrong accrual date in calculating interest under the statute. Weiser-Brown cross-appealed, claiming that the district court erred by granting judgment as a matter of law in favor of St. Paul on Weiser-Brown's bad-faith claim. For the reasons that follow, we AFFIRM.

I.

Weiser-Brown, a small company based in Arkansas, operates wells that explore for oil in Arkansas, Texas, and Louisiana. Weiser-Brown had a control-of-well insurance policy with St. Paul, by which St. Paul agreed to, among other things, "reimburse [Weiser-Brown] for actual costs and/or expenses incurred . . . in regaining or attempting to regain control of any and all Wells Insured which get out of control." The policy explained that "a Well shall be deemed out of control . . . when there is an unintended subsurface flow of oil, gas, water, and/or fluid from one subsurface zone to another subsurface zone via the bore of the Well, which cannot be controlled by the blowout preventer . . . or other equipment required."

Weiser-Brown was the operator and a working-interest owner of the Viking No. 1 well, located in Lavaca County, Texas. In August 2008, while drilling the Viking No. 1, Weiser-Brown experienced a loss of control of the Viking No. 1.[1] In March 2009, Weiser-Brown notified St. Paul that it was

---

[1] Whether the Viking No. 1 was ever out of control, as defined by the insurance policy, was a point of major contention at trial. The jury, and subsequently the district court, found that the Viking No. 1 was out of control and, thus, the costs incurred in attempting to regain

No. 13-20442

interested in making a claim under the insurance policy for the August 2008 event. St. Paul acknowledged the claim and appointed a loss adjuster, BC Johnson Associates, to investigate. In a letter dated March 9, 2009, BC Johnson requested seventeen categories of information from Weiser-Brown, including daily drilling reports, the Joint Operating Agreement, and "invoice cost documentation." Within one month, Weiser-Brown sent some, but not all, of the requested documentation to BC Johnson. On June 9, 2009, BC Johnson sent a letter to Weiser-Brown indicating that it had received the daily drilling reports, the Joint Operating Agreement, and some of the invoices, but still needed several documents, including any additional invoices, mud logs, and noise and temperature logs.

On September 29, 2009, BC Johnson's Bob Kachnik informed Weiser-Brown, via e-mail, that an independent expert, David Watson, had reached a preliminary conclusion that "there was not a subsurface loss of control" of the Viking No. 1. Kachnik noted that Watson requested some additional information from Weiser-Brown, including "[a] mud log across the sidetrack wellbore"; "[a]ll daily reports prepared by the mud logger"; and "[a]ll daily mud reports prepared by Spirit's mud engineer." Kachnik asked Weiser-Brown to provide the additional information and to "advise" if it believed Watson's conclusion was incorrect. Weiser-Brown continued to send documents to BC Johnson in October and November 2009. On November 6, 2009, Weiser-Brown sent BC Johnson "the [s]idetrack log."

On February 8, 2010, Kachnik informed Weiser-Brown that after reviewing the additional information, Watson had not changed his conclusion that the Viking No. 1 was never out of control. The e-mail from Kachnik

---

control were covered by the insurance policy. Because St. Paul is not appealing this determination, we find it unnecessary to detail the events that took place at the well in 2008.

concluded: "Again, please review this report and if you believe that the conclusions reached in the report are incorrect, please advise accordingly and provide any information or documentation in support." In March and April 2010, St. Paul sent two letters to Weiser-Brown explaining that it had not received a response from Weiser-Brown to Watson's report and that it would close the claim in thirty days if no response was received. On April 26, 2010, Weiser-Brown responded that it was "studying the matter" and would "respond to that report shortly." On June 7, 2010, Weiser-Brown sent a one-page response to Watson's report, challenging his neutrality and conclusion. On June 23, 2010, St. Paul acknowledged receipt of Weiser-Brown's response and indicated that it would forward the response to Watson "for further review and comment." On July 16, 2010, Weiser-Brown filed the present lawsuit.

Weiser-Brown alleged that St. Paul breached the insurance agreement and brought claims for breach of contract and for bad faith, in violation of Texas Insurance Code § 541.[2] As part of its breach-of-contract claim, Weiser-Brown asserted that St. Paul was liable under the Prompt-Payment Statute for 18% interest on any damages awarded. During trial, the parties agreed to submit the Prompt-Payment Statute issue to the court if the jury returned a verdict in favor of Weiser-Brown. At the close of Weiser-Brown's case, St. Paul moved for judgment as a matter of law on Weiser-Brown's § 541 bad-faith claim. The district court granted St. Paul's motion, stating "I do not believe there's been a showing of bad faith, and I'm not going to have that go to the jury." The breach-of-contract claim went to the jury in the form of four questions, which essentially asked: (1a) Did Weiser-Brown comply with the insurance policy's submission requirements relating to loss, damage, occurrence and a "sworn

---

[2] Initially, Weiser-Brown asserted only a breach of contract claim. However, on January 19, 2012, Weiser-Brown filed a third amended complaint in which it added a bad-faith claim against St. Paul.

proof of loss"? (1b) If not, did St. Paul waive compliance with these conditions? (2) Did St. Paul breach the insurance policy by not paying Weiser-Brown's claim? (3) What are Weiser-Brown's damages?  While the jury found that Weiser-Brown had not complied with the contract's conditions, the jury also found that St. Paul had waived compliance with those conditions.  It further found that St. Paul breached the insurance agreement and awarded Weiser-Brown $2,290,457.03 in damages.

The parties then submitted the prompt-payment issue to the court.  After extensive briefing and oral argument, the district court issued Findings of Fact and Conclusions of Law.  The district court concluded that St. Paul violated the Prompt-Payment Statute, specifically § 542.056(a), when it failed to accept or reject Weiser-Brown's claim within fifteen days of receiving "all items, statements, and forms required by the insurer to secure final proof of loss." Tex. Ins. Code § 542.056(a).  The court found that "[b]y November 6, 2009, Weiser-Brown had complied with 'most,' but not all, of the requests for information in Watson's report."  The court also held that, despite any omission, "St. Paul and its adjusters did not indicate in the February 8, 2010; March 30, 2010; or April 21, 2010 correspondence that any request for information remained unfulfilled or that determination of coverage was contingent upon receiving such information."  Because St. Paul did not accept *or* reject Weiser-Brown's claim fifteen days later, on November 21, 2009, the district court held that St. Paul was liable to Weiser-Brown for "interest on the amount of the claim at a rate of 18 percent a year" from that date.  Tex. Ins. Code § 542.060(a).  The court subsequently entered a final judgment ordering St. Paul to pay $1,232,328.14 in interest under the Prompt-Payment Statute.

St. Paul timely appealed and argues that the district court erred in concluding that St. Paul violated the Prompt-Payment Statute or, alternatively, the district court miscalculated the statutory interest.  Weiser-

No. 13-20442

Brown cross-appealed, arguing that its bad-faith claim should have gone to the jury and that the district court improperly excluded evidence of bad faith.

II.

In this diversity case, this court applies state substantive law, but federal procedural law. *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 248 (5th Cir. 2014). "We review the district court's conclusions of law de novo and its findings of fact for clear error." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290 (5th Cir. 1995); *see also Flowers Transp., Inc. v. M/V Peanut Hollinger*, 664 F.2d 112, 113 (5th Cir. 1981) ("[T]he trial judge's findings of fact are not to be overturned unless they are clearly erroneous." (citing Fed. R. Civ. P. 52(a))); *In re Matter of Complaint of Settoon Towing, L.L.C.*, 720 F.3d 268, 276 (5th Cir. 2013) ("[W]e review interpretations of state law de novo."). We must interpret Texas's statutes the way we believe the Texas Supreme Court would. *See F.D.I.C. v. Shaid*, 142 F.3d 260, 261 (5th Cir. 1998). "When the highest state court is silent on an issue we must make an *Erie* guess, using the sources of law that the state's highest court would look to." *Symetra*, 775 F.3d at 248.

III.

St. Paul contends that the district court misinterpreted and misapplied § 542.056 of the Prompt-Payment Statute when it determined that St. Paul violated that section of the statute.

A.

The Prompt-Payment Statute,[3] "provides for additional damages when an insurer wrongfully refuses or delays payment of a claim." *Lamar Homes,*

---

[3] The Prompt-Payment Statute was formerly codified as article 21.55 of the Texas Insurance Code. The statute was re-codified without substantial change. *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007).

*Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007). As the Texas Supreme Court has summarized,

> [t]he prompt-payment statute provides that an insurer, who is "liable for a claim under an insurance policy" and who does not promptly respond to, or pay, the claim as the statute requires, is liable to the policy holder or beneficiary not only for the amount of the claim, but also for "interest on the amount of the claim at a rate of eighteen percent a year as damages, together with reasonable attorney's fees."

*Id.* (quoting Tex. Ins. Code. § 542.060(a)). In order to recover interest under the Prompt-Payment Statute, an insured must establish: "(1) a claim under an insurance policy; (2) that the insurer is liable for the claim; and (3) that the insurer has failed to follow one or more sections of [the Prompt-Payment Statute] with respect to the claim." *GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 830-31 (Tex. App.—Fort Worth 2008, no pet. 2008) (citing *Allstate Ins. Co. v. Bonner*, 51 S.W.3d 289, 291 (Tex. 2001), *modified on other grounds*, No. 00-0282, 2001 WL 1412951, at *1 (Tex. 2001)). The statute is to be "liberally construed to promote the prompt payment of insurance claims." Tex. Ins. Code § 542.054.

The statute establishes a series of claim-handling and claim-payment deadlines for insurers. *See* Tex. Ins. Code §§ 542.055-.058. First, § 542.055, entitled "Receipt of Notice of Claim," provides that within fifteen days of receiving notice of a claim, the insurer must acknowledge receipt of the claim, commence an investigation, and request "all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant." Tex. Ins. Code § 542.055(a). Next, § 542.056, entitled "Notice of Acceptance or Rejection of Claim," requires the insurer to "notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms

required by the insurer to secure final proof of loss." Tex. Ins. Code § 542.056(a). The statute allows insurers to extend this deadline for an additional forty-five days if "the insurer is unable to accept or reject the claim" and "notif[ies] the claimant of the reasons that the insurer needs additional time." Tex. Ins. Code § 542.056(d). If the insurer accepts the claim and "notifies a claimant under [§] 542.056 that the insurer will pay a claim or part of a claim," it has five days to do so. Tex. Ins. Code § 542.057(a). Finally, § 542.058, entitled "Delay in Payment of Claim," provides that "if an insurer, after receiving all items, statements, and forms reasonably requested and required under [§] 542.055, delays payment of the claim . . . for more than 60 days, the insurer shall pay damages and other items as provided by [§] 542.060." Tex. Ins. Code § 542.058(a).

Section 542.060 provides the "enforcement mechanism" for the statute's deadlines. *Cox Operating, L.L.C. v. St. Paul Surplus Lines Ins. Co.*, 795 F.3d 496, 505 (5th Cir. 2015). That section provides that "[i]f an insurer that is liable for a claim under an insurance policy is not in compliance with this subchapter, the insurer is liable to pay the holder of the policy . . . interest on the amount of the claim at a rate of 18 percent a year as damages, together with reasonable attorney's fees." Tex. Ins. Code § 542.060(a). This court recently held that although § 542.058 is the only section that explicitly refers to the penalties in § 542.060, "a violation of *any* of the Act's deadlines . . . begins the accrual of statutory interest under § 542.060."[4] *Cox Operating*, 795 F.3d at 509. Accordingly, if St. Paul violated § 542.056, as the district court found,

---

[4] St. Paul's secondary argument before us is that a violation of § 542.056 does not trigger the penalty provision in § 542.060. St. Paul asks us to reform the judgment so that interest does not begin to accrue until 60 days after the district court's chosen accrual date, when St. Paul would have been in violation of § 542.058, rather than § 542.056. Our recent holding in *Cox Operating* forecloses this argument. *See Cox Operating,* 795 F.3d at 509.

No. 13-20442

then the correct accrual date for statutory interest was the date of that violation, consistent with the district court's calculation. *See id.* at 509 n.4.

B.

The parties do not dispute that St. Paul never accepted or rejected Weiser-Brown's claim until after the present lawsuit was filed. The question presented on appeal is whether St. Paul received "all items, statements, and forms required by the insurer to secure final proof of loss" such that § 542.056's fifteen-day deadline was triggered, and subsequently violated. *See* Tex. Ins. Code § 542.056(a). St. Paul argues that the district court "improperly changed the wording in 542.056" and urges us to look at "the plain meaning of the statute's language." St. Paul concedes, however, that "[t]he statute does not define what items are necessary to constitute a 'final proof of loss.'"

In addition to a lack of statutory guidance, there has been little guidance from Texas courts about information covered by § 542.056. *See Colonial Cnty. Mut. Ins. Co. v. Valdez*, 30 S.W.3d 514, 523 (Tex. App.—Corpus Christi 2000, no pet.) ("We are unaware of any Texas case examining what documents are 'required by the insurer to secure final proof of loss' for purposes of triggering the deadlines in [§ 542.056]."). The clearest statement was made by the Texas Court of Appeals in *GuideOne Lloyds Insurance Company v. First Baptist Church of Bedford*,[5] which, interpreting the "plain language of" § 542.056, concluded that "final proof of loss" did not require information regarding the *extent* of the loss, only information proving that a loss occurred. 268 S.W.3d at 834-35.[6] In *GuideOne*, which involved an insurance claim for roof damage, the

---

[5] "In making an Erie guess in the absence of a ruling from the state's highest court, this Court may look to the decisions of intermediate appellate state courts for guidance." *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000).

[6] The *GuideOne* court cited the previous version of the Prompt-Payment Statute, article 21.55 of the Texas Insurance Code. *See GuideOne*, 268 S.W.3d at 834-35. The current

trial court determined that the insurer violated § 542.055 when it failed to request any items, statements, or forms from the insured within fifteen days of receiving notice of the claim. *Id.* at 834; § 542.055(a)(3). The trial court used the date of this § 542.055 violation to calculate statutory interest under the Prompt-Payment Statute. *Id.* at 834 n.7. On appeal, the insurer shifted focus to § 542.056 of the Prompt-Payment Statute and argued that because it had an outstanding request for information required to determine final proof of loss, penalty interest should not have begun to accrue according to the district court's calculation. *Id.* at 833-35. Specifically, the insurer contended that nearly six months after receiving notice of the claim it sent a written request for "core samples to determine the extent of the damage." *Id.* at 834. Rejecting the insurer's argument, the *GuideOne* court reasoned:

> Taking core samples of [the insured's] roof may have been required to determine the extent of [the insured's] loss, but it would not have been required to prove that [the insured] in fact suffered a loss, which, according to the plain language of [§ 542.056], is required for an insurer to make its decision to accept or reject the claim.

*Id.* at 835. By this logic, § 542.056's reference to information "required by the insurer to secure final proof of loss" refers to information demonstrating that the insured in fact suffered a loss. According to the *GuideOne* court, the extent of the loss is not determinative of § 542.056 and the fifteen-day acceptance/rejection deadline. *Id.* at 834-35 (explaining that "GuideOne's reason for sending the letter was for a purpose other than what is relevant to this issue").

---

version of the statute, re-codified as § 542 of the Texas Insurance Code, remains largely the same. *See supra* note 3.

No. 13-20442

The *GuideOne* court relied on *Colonial County Mutual Insurance Co. v. Valdez*, as support for its statutory interpretation. *See GuideOne*, 268 S.W.3d at 835. *Colonial County* involved an insurance claim for car theft and an alleged violation of the Unfair Settlement Practices Act, rather than the Prompt-Payment Statute. 30 S.W.3d at 516, 522. However, because the parties urged the court to interpret the terms of the Unfair Settlement Practices Act in light of the deadlines established by the Prompt-Payment Statute, the court interpreted and discussed § 542.056. *Id.* at 522. The insurer had requested eight pieces of information from the insured and argued that because it did not receive all of the requested information, it never received all "items, statements, and forms required by the insurer to secure final proof of loss" and, therefore, did not fail to promptly accept or reject the claim. *Id.* at 522-23 (quoting Tex. Ins. Code § 542.056). Noting that it was "unaware of any Texas case examining what documents are 'required by the insurer to secure final proof of loss,'" the court relied on "[c]ommon sense," to find that "materials such as service records, sets of keys, and photographs of the vehicle are irrelevant to proving the loss of the vehicle." *Id.* at 523. Because these missing materials were irrelevant to proving that the claimed loss occurred, the court reasoned, they did not excuse the insurer's failure to affirm or deny coverage within the deadline provided by § 542.056. *Id.*

St. Paul relies heavily on the Texas Supreme Court's decision in *Lamar Homes, Inc. v. Mid-Continental Casualty Co.*, 242 S.W.3d 1 (Tex. 2007). In *Lamar Homes*, the Texas Supreme Court, answering a question certified by this court, held that the Prompt-Payment Statute applies to an insurer's breach of the duty to defend. *Id.* at 16, 20. The court acknowledged that some Texas courts found application of the Prompt-Payment Statute to defense claims "unworkable," as it was difficult to calculate and apply interest to a claim that "has no finite value at the time the insurer denies it." *Id.* at 19. The

11

court responded that in the context of a claim for defense, where the insured has not yet suffered a quantifiable loss when it makes the claim, the insured "would have to submit his legal bills to the insurance company, as received, to mature its rights under the prompt-payment statute." *Id.* The court explained:

> [W]hen the insurer wrongfully rejects its defense obligation, the insured has suffered an actual loss that is quantified after the insured retains counsel and begins receiving statements for legal services. These statements or invoices are the last piece of information needed to put a value on the insured's loss. *See* Tex. Ins. Code. § 542.056(a). And when the insurer, who owes a defense to its insured, fails to pay within the statutory deadline, the insured matures its right to reasonable attorney's fees and the eighteen percent interest rate specified by the statute. *Id.* § 542.060.

*Id.* at 19.

St. Paul indicates that the reference in *Lamar Homes* to the "last piece of information needed to put a value on the insured's loss" means that, under § 542.056, Weiser-Brown needed to provide "evidence of the dates and amounts of its costs demonstrating loss" and "proof that it incurred the out-of-pocket costs for the loss." When read in context, however, *Lamar Homes* does little to guide our analysis of § 542.056 in this case. In describing how the Prompt-Payment Statute would apply to an insurer's wrongful denial of a claim for defense, and subsequent failure to pay within the statutory deadlines, the *Lamar Homes* court was analyzing a violation of § 542.058 rather than § 542.056.[7] *See Lamar Homes*, 242 S.W.3d at 19. Further, the court was

---

[7] As previously explained, § 542.056 requires the insurer to accept or reject a claim within fifteen days of receiving certain information. The rejection of a claim, even if wrongful, does not violate § 542.056, if done timely. *See* Tex. Ins. Code § 542.056(a). If an insurer wrongfully rejects a claim, the insurer will violate § 542.058 of the statute when it subsequently fails to pay the claim within the statutory deadline. *See Higginbotham v. State*

explaining how statutory interest would accrue with respect to a unique type of claim, "which typically has no finite value at the time the insurer denies it." *Id.* The court recognized that even though the insured is injured when his claim for defense is wrongfully denied, his injury is not quantifiable until "after the insured retains counsel and begins receiving statements for legal services." *Id.* It follows logically then that the insured would need to submit those invoices, and thus quantify a loss, before the insurer could be penalized for failing to timely pay the claim.

Finally, the district court relied on *Lee v. Caitlin Specialty Insurance Co.*, 766 F. Supp. 2d 812 (S.D. Tex. 2011), a case involving roof damage under a wind-storm insurance policy. After hiring a roofing consultant to inspect the roof, the insurer's adjuster concluded in a report, dated March 20, 2009, that the roof damage was not caused by wind. *Id.* at 816. In a motion for summary judgment, the insurer argued that it did not have to notify the insured of its rejection of the claim because it never received certain pieces of information that it requested, including an invoice for roof repair and leases between the building owner and tenants. *Id.* at 826. The district court rejected this argument. Emphasizing that the insurer's adjuster had already finished his investigation and had done so without the missing documentation, the court found that the insurer had "not demonstrated that such documentation was required for it to make its determination." *Id.* Accordingly, the court denied summary judgment, finding that there was a genuine issue of fact as to whether all documentation "required for the insurer to secure final proof of loss," under § 542.056, had been submitted, even in the absence of the invoice and leases. *Id.*

---

*Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 461 (5th Cir. 1997) ("A wrongful rejection of a claim may be considered a delay in payment for purposes of the 60-day rule and statutory damages.").

No. 13-20442

While these decisions are helpful in analyzing the contours of the proof-of-loss documentation described in § 542.056, we do not today endorse as determinative the approach taken in any one decision.  Instead, we find that common to all of these decisions is the understanding that the information and documentation "required by the insurer to secure final proof of loss" under § 542.056 will depend on the facts and circumstances involved in a given case. *See* 13 Couch on Ins. § 189:1 ("[I]n most cases, there is no objective measure of exactly what information the insurer does and does not need, and the universe of information available in any given case varies considerably.").   The documents required to prove a loss with respect to a defense claim might differ from the documents required to prove a loss with respect to a roof-damage claim that the insurer has already determined is only partially covered. *Compare Lamar Homes*, 242 S.W.3d at 19, *with GuideOne*, 268 S.W.3d at 834-35, *and Lee*, 766 F. Supp. 2d at 826; *see also* 13 Couch on Ins. § 189:4 ("More so than the notice of loss, the contents of proofs of loss tend to vary by type of insurance.  The common thread to proofs, of course, is that the information supplied must establish that the loss falls within the coverage terms of the policy.").  Rather than embark on the challenging, perhaps impossible, task of listing each piece of information for purposes of § 542.056(a), we think it appropriate to turn to the specific facts and contract in this case, as examined and found by the district court.

## C.

On March 9, 2009, BC Johnson, St. Paul's appointed loss adjuster, sent a letter to Weiser-Brown requesting seventeen categories of information.  By June 9, 2009, BC Johnson had received a significant amount of information, though not all of the information it requested.  BC Johnson's Bob Kachnik wrote a letter to Weiser-Brown indicating that it had received: 1) "IADC or contractor daily drilling reports from date of spud through the end of the claim

14

period"; 2) "Joint Operating Agreement or other Participating Agreement including division of interests and insurance provisions, if any"; 3) "[w]ritten explanation outlining what Weiser-Brown believes caused the underground well out of control event"; 4) "[o]riginal well plan" and "AFE and well permit"; 5) "[w]ell bore schematic"; 6) "Drilling Contract including any modifications or amendments"; 7) confirmation that Weiser-Brown did not plan to re-drill the well; and 8) some "[c]opies of invoice cost documentation." The letter indicated that BC Johnson still needed several documents, including additional invoices, mud logs, and noise and temperature logs. An e-mail and spreadsheet, dated June 10, 2009, showed that BC Johnson had received dated invoices from Weiser-Brown, with vendor, service, and cost descriptions, totaling $4.5 million. In addition to the $4.5 million worth of invoices, BC Johnson also received "a lot of field tickets/delivery tickets not attached to invoices," which Kachnik informed Weiser-Brown were incomplete without the "[a]ctual invoices" attached.

On September 29, 2009, BC Johnson informed Weiser-Brown that an independent expert decided, based on the information provided, that there had not been a covered "subsurface loss of control" of the Viking No. 1 well. At that time, Kachnik noted that the expert requested three pieces of additional information, and Weiser-Brown responded by sending additional information. On October 29, 2009, Kachnik explained that "the information is incomplete." Kachnik stated that "[t]he mud log across the sidetrack hole stops at approximately 7,970 feet. We would like to see the rest of this log through the total depth of 10,757 feet." Kachnik also asked for "the mud check sheets filled out every day by the mud engineer." On November 6, 2009, Weiser-Brown sent "the Sidetrack log" to BC Johnson.[8]  On February 8, 2010, BC Johnson

---

[8] BC Johnson later referred to this as the "mud log."

informed Weiser-Brown that Watson's conclusions had not changed based on the additional information received from Weiser-Brown.  After November 6, BC Johnson did not indicate that any specific information was missing until after the lawsuit was filed.  BC Johnson did instruct Weiser-Brown that if it disagreed with the expert's conclusions, it could submit a response and provide "any information or documentation in support," but BC Johnson did not indicate that any specific additional information was necessary or missing.

The district court found very precisely that as of November 6, 2009, "Weiser-Brown had complied with 'most,' but not all, of the requests for information in Watson's report."  As the district court emphasized, neither St. Paul nor its adjuster requested additional information in its later correspondence or ever indicated that the determination of coverage was dependent on missing documentation.  Based on all of the provided documents, St. Paul's retained expert concluded in September 2009 that there had been no covered event at all.  St. Paul maintained this position through the entire claims-handling process and through the trial.  The district court concluded that St. Paul's request that Weiser-Brown respond to Watson's report if it disagreed, "was not a reasonable request for information necessary or required to determine whether the Viking No. 1 was a well 'out of control.'"  St. Paul contends, however, that three pieces of information were missing, such that the fifteen-day deadline provided by § 542.056 never began to run.  First, St. Paul claims that although Weiser-Brown submitted invoices, it did not submit evidence, such as checks, showing that it actually paid those invoices, and thus did not establish that it experienced an out-of-pocket, compensable loss, until after the lawsuit was filed.  Second, St. Paul claims that it requested, but never

16

received, "proof of the claimed insurable interest."[9]  Finally, St. Paul contends that Weiser-Brown failed to provide "the engineering data that it relied upon to prove its loss."  Specifically, St. Paul claims that the "mud reports and check sheets" were missing.

We affirm the district court's factual finding that these few additional items did not operate to nullify application of § 542.056.  By November 6, 2009, Weiser-Brown had repeatedly answered St. Paul's numerous requests, providing information that established that an actual loss occurred, when, where, and how it occurred, as well as $4.5 million dollars of supporting invoices.  St. Paul's expert assessed this information to conclude that the loss was not covered by the insurance policy, a position that St. Paul never communicated as notification of rejection of Weiser-Brown's claim yet pursued into the lawsuit as its reason for denying the claim, which the jury rejected. Not only was information alleged to have been missing not requested in communications from St. Paul—notably, "checks evidencing an out-of-pocket loss" and "documentary evidence of owners opting in or out of the insurance"— this information also was not determinative of St. Paul's position refusing

---

[9] It is unclear what additional documentation Weiser-Brown would have been expected to submit to prove the "claimed insurable interest."  BC Johnson requested Weiser-Brown to provide the "Joint Operating Agreement or other Participation Agreement including division interests and insurance provisions."  The Joint Operating Agreement governed the relationship among the operator, Weiser-Brown, and the non-operating interest owners.  As St. Paul admits, the Joint Operating Agreement required Weiser-Brown to carry well-control insurance for the other owners, and owners who did not want to be covered by Weiser-Brown's insurance had to opt-out.  Weiser-Brown complied with BC Johnson's request, provided a copy of the Joint Operating Agreement.  Further, a comprehensive report by BC Johnson, dated March 2010, indicates Weiser-Brown "advised in writing that no non-operating interest owners opted out of the coverage."  On appeal, St. Paul argues that Weiser-Brown did not provide "documentary evidence of owners opting in or out of the insurance." But because no owners opted out of coverage, there was no documentary evidence to provide. St. Paul claims that Weiser-Brown did not establish the insurable working interest until January 2012, when lawyers for Weiser-Brown sent an e-mail stating "we confirm that there were no opt outs."  This overlooks the previously-received written advisement that there were no opt-outs.

No. 13-20442

Weiser-Brown's claim.  Accordingly, based on the facts in this case, we hold that the district court correctly found that the fifteen-day deadline under § 542.056 began to run on November 6, 2009.

St. Paul's reliance on Kachnik's trial testimony does not change our conclusion.  At trial, Kachnik claimed that St. Paul did not have enough information from Weiser-Brown until after the lawsuit was filed.  Kachnik stated: "[A]gain, it takes that back and forth between the adjuster and the oil company to sort out any questions.  That hadn't taken place.  So, we weren't in a position to come to any kind of final numbers on it at that point."  Kachnik's testimony underscores why St. Paul's argument is flawed.  There had been no "back and forth between the adjuster and the oil company" to sort out a final loss amount because St. Paul concluded, and maintained, based on items of information requested and received, that the event was not covered.  Such negotiations and finalization would have been futile in the face of Watson's position that there was no coverage, which is a chronology that may underlie the jury verdict finding that St. Paul waived the policy "conditions" relating to submissions of loss and proof of loss.  Indeed, St. Paul offered the waiver question for the jury and suggested to the district court that the jury charge already included the necessary instruction on that point.  Moreover, St. Paul acknowledges that it is not the case that the insured must comply with *all* document requests made by the insurer, no matter how irrelevant.  The insurer cannot avoid liability under § 542.056 by pointing after-the-fact to missing information, the absence of which did not affect the insurer's decision.  *See generally Devonshire Real Estate & Asset Mgmt., LP v. Am. Ins. Co.*, No. 3:12-CV-2199-B, 2014 WL 4796967, at *22-23 (N.D. Tex. Sept. 26, 2014) (tying the 15-day acceptance/rejection deadline, under § 542.056, to the insurer's obligation, under § 542.055, to "request from the claimant all items . . . that the insurer reasonably believes, at that time, will be required from the

18

No. 13-20442

claimant"); *see also* Tex. Ins. Code § 542.058 (giving an insurer 60 days to pay a claim "after receiving all items, statements, and forms *reasonably requested and required* under Section 542.055" (emphasis added)).  Instead, Texas's prompt-payment statutory scheme contemplates several alternatives available to insurers, including, (1) requesting additional time, pursuant to § 542.056(d); (2) rejecting an insufficiently supported claim, pursuant to § 542.056(a); or (3) accepting a claim, but agreeing to only "pay . . . part of a claim" because of insufficient information of loss, pursuant to § 542.057(a).

## IV.

Weiser-Brown cross-appeals claiming that the district court erred in granting St. Paul's motion for judgment as a matter of law on Weiser-Brown's bad-faith claim, under Texas Insurance Code § 541.  Weiser-Brown contends that it presented evidence at trial that St. Paul violated the Insurance Code by engaging in bad-faith claims handling and that this claim should have gone to the jury.

## A.

We review the district court's decision to grant a motion for judgment as a matter of law *de novo.  DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 427 (5th Cir. 2003).  "Judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'" *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997) (quoting Fed. R. Civ. P. 50(a)).  We must consider all of the evidence in the light most favorable to the non-movant, here Weiser-Brown. *Foreman*, 117 F.3d at 804.  However, "there must be more than a mere scintilla of evidence in the record to render the grant of JMOL inappropriate." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001).  We will affirm the district court

if the result is correct, "even if our affirmance is upon grounds not relied upon by the district court." *Foreman*, 117 F.3d at 804.

Texas Insurance Code § 541.003 provides that "[a] person may not engage in this state in a trade practice that is defined in this chapter as or determined under this chapter to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." The Insurance Code lists several "unfair method[s] of competition" and "unfair or deceptive act[s] or practice[s]," such as: "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement"; "failing within a reasonable time to . . . affirm or deny coverage of a claim to a policyholder"; "refusing to pay a claim without conducting a reasonable investigation with respect to the claim." Tex. Ins. Code §541.060(a). The "reasonable-basis test" applies to a cause of action against the insurer for bad faith under the Insurance Code. *See Henry v. Mut. of Omaha Ins. Co.*, 503 F.3d 425, 428-49 (5th Cir. 2007). The insurer "will not be faced with a tort suit for challenging a claim of coverage if there was *any reasonable basis* for denial of that coverage." *Id.* at 429 (emphasis added) (citation and internal quotation marks omitted); *see also Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997) ("A cause of action for breach of the duty of good faith and fair dealing exists when the insurer has *no reasonable basis* for denying or delaying payment of a claim.").[10] "Evidence establishing only a bona fide coverage dispute does not demonstrate bad faith." *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998).

---

[10] While the court in *Higginbotham* was describing the elements of a bad-faith claim under common law, the court explained that "Texas courts have clearly ruled that these extra-contractual tort claims require the same predicate for recovery as bad faith causes of action in Texas." *Id.* at 460.

No. 13-20442

B.

On January 19, 2012, over one year after filing the present lawsuit, Weiser-Brown filed a third amended complaint adding claims for breach of duty of good faith and deceptive insurance practices, under Texas Insurance Code § 541.[11]  In its motion for leave to amend the complaint, Weiser-Brown cited events that took place during the course of the litigation as the basis for the new bad-faith claim.  Specifically, Weiser-Brown claimed that based on St. Paul's corporate deposition and motion for partial summary judgment, it was evident that St. Paul was basing its decision to deny coverage on reasons that it knew to be false.  Shortly before trial, the district court ruled on several motions in limine.  Relevant here, the district court excluded evidence of post-litigation conduct by St. Paul.  The district court also excluded testimony of Weiser-Brown's expert, Bill Arnold.  At the close of Weiser-Brown's case, the district court granted St. Paul's motion for judgment as a matter of law on the bad-faith claim.

C.

We find that the district court properly granted judgment as a matter of law, as there was no legally sufficient evidentiary basis for a reasonable jury to have found that St. Paul violated Texas Insurance Code § 541. *See Foreman*, 117 F.3d at 804.  As previously described, a claim of bad faith under the Texas Insurance Code requires a showing that there was no reasonable basis to deny or delay payment of the claim. *See Henry*, 503 F.3d at 428-29.  The evidence presented at trial, however, established a bona fide coverage dispute between Weiser-Brown and St. Paul. *See Simmons*, 963 S.W.2d at 44.  The control-of-well insurance policy at issue required "an unintended subsurface flow of oil,

---

[11] At trial, Weiser-Brown's counsel made clear that it was not pursuing a common law bad-faith claim, only a statutory bad-faith claim, under § 541.

gas, water, and/or fluid from one subsurface zone to another subsurface zone via the bore of the Well, which cannot be controlled by the blowout preventer . . . or other equipment required." Determining whether such a covered event took place at the Viking No. 1 well required analysis of complex subsurface geological conditions. In fact, Weiser-Brown did not submit a claim until seven months after the incident because it did not know if it had coverage for what had occurred. Therefore, seven months after the incident in question, St. Paul's adjuster, BC Johnson, had to reconstruct what happened at the well.

Weiser-Brown emphasizes that in June 2009, BC Johnson's Bob Kachnik reached a preliminary conclusion that there was no coverage but did not inform Weiser-Brown of a potential coverage issue until September 2009.[12] As noted above, Weiser-Brown does not dispute that in June 2009, BC Johnson was still waiting to receive documents from Weiser-Brown. At that time, Kachnik requested that St. Paul hire an expert "to take a second look at his conclusion that the insured has not supported . . . that a [control-of-well] event occurred." The expert, David Watson, wrote an eighteen-page report in which he concluded that "[t]he available evidence does not demonstrate an underground blowout in either the original or the sidetrack wellbore." Watson indicated, however, that additional pieces of information "would benefit my interpretation of the well operations and my opinions may change or be supplemented." Upon receipt of Watson's report, Kachnik acknowledged that Watson's "definition of an underground blowout may be a bit strict." However, Kachnik stated that "he makes some good points and asks for additional information," and, with St. Paul's permission, sent the report to Weiser-Brown on September 29, 2009, soon after it was written. Rather than support a bad-

---

[12] At trial, Kachnik denied having reached such a conclusion and asserted St. Paul's claim notes mischaracterized his position.

faith finding, the evidence of St. Paul's and BC Johnson's conduct from June to September 2009 demonstrates an effort on their part to obtain an expert opinion on a complicated coverage issue.

Of course, the jury ultimately disagreed with Kachnik and Watson and found that the Viking No. 1 well did experience an underground loss of control. However, the evidence at trial was insufficient to support a conclusion that coverage was obvious or that St. Paul had no reasonable basis to deny Weiser-Brown's claim. *Simmons*, 963 S.W.2d at 44 ("Evidence establishing only a bona fide coverage dispute does not demonstrate bad faith."). At trial, Weiser-Brown's own expert described what took place at the well as "quite complicated." While he testified that the Viking No. 1 did experience an underground, interzonal flow, he explained that it was "not a raging flow from one zone to another," but an "intermittent partial flow" that the operator could only "partially control."

Weiser-Brown contends that "St. Paul engaged in an outcome-oriented investigation" and that BC Johnson and Watson were not independent. However, other than the fact that Kachnik suggested three "minor edits" to Watson's report, there was no evidence at trial that Kachnik and Watson worked together, much less that they conspired to deny coverage to Weiser-Brown. There was no evidence that either Kachnik or St. Paul influenced Watson's conclusion. While Weiser-Brown contends that "St. Paul permitted its engineering consultant to confirm [Kachnik's] conclusion by using a wrong and overly restrictive definition of the term on which it based its denial of coverage," the fact that Kachnik acknowledged this weakness in Watson's report supports the opposite of a concerted effort to deny coverage. The evidence at trial was insufficient to support Weiser-Brown's allegations of bad faith and, thus, the district court properly granted judgment as a matter of law. *See Foreman*, 117 F.3d at 804 (quoting Fed. R. Civ. P. 50(a)).

Further, contrary to Weiser-Brown's contention, the district court did not improperly exclude evidence that would have supported the bad-faith claim. As this court has repeated, "[d]istrict courts are given broad discretion in rulings on the admissibility of evidence; we will reverse an evidentiary ruling only when the district court has clearly abused this discretion and 'a substantial right of [a] party is affected.'" *Rock v. Huffco Gas & Oil Co., Inc.*, 922 F.2d 272, 277 (5th Cir. 1991) (quoting *Muzyka v. Remington Arms Co., Inc.*, 774 F.2d 1309, 1313 (5th Cir. 1985)); *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) ("In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings."). Further, "we may not disturb the district court's exclusion of the evidence . . . if that ruling can be upheld on other grounds, regardless of whether the court relied on those grounds." *Brazos River Auth. V. GE Ionics, Inc.*, 469 F.3d 416, 423 (5th Cir. 2006) (citation and internal quotation marks omitted).

Weiser-Brown first argues that the district court erred in excluding evidence of St. Paul's post-litigation conduct, which, Weiser-Brown contends, supported its bad-faith claim. Before the district court, Weiser-Brown indicated that it wanted to introduce numerous post-litigation filings, "even copies of the answer [St. Paul] might have filed to the complaint." On appeal, Weiser-Brown limits its focus to St. Paul's unsuccessful summary judgment motion, filed in November 2011. Weiser-Brown claims that St. Paul's motion was based on "grounds that [St. Paul] knew were meritless," such as late notice and questions of well ownership. However, Weiser-Brown misconstrues St. Paul's summary judgment motion. As Weiser-Brown describes, "St. Paul moved for partial summary judgment on the bases that (1) Weiser-Brown's notice of loss was *untimely* and (2) the question about the insurable interest

was *unresolved.*" Neither of these descriptions is accurate. In the cited motion, St. Paul did state, in the statement of undisputed facts, that "Weiser-Brown gave its first notice to St. Paul of the two alleged well control incidents some seven months later." However, St. Paul did not argue that summary judgment was warranted on that basis. Further, St. Paul discussed the unresolved insurable interest issue in the same context that it has done so before us—arguing that the claims-handling deadlines provided by the Prompt-Payment Statute had not been triggered. Rather than containing arguments that St. Paul "already conceded were baseless," the motion for summary judgment raised complex legal issues involving, among other things,[13] interpretation and application of the Prompt-Payment Statute. Faced with a category of evidence that, if admitted, could result in extensive post-litigation filings, which, even if relevant, would likely confuse the jury, the district court did not abuse its discretion by excluding evidence of St. Paul's post-litigation conduct. Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Similarly, we do not find that the district court abused its discretion in excluding testimony of Weiser-Brown's expert, Bill Arnold. Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

---

[13] In the motion for summary judgment, St. Paul also argued that Weiser-Brown's breach-of-contract claim had no merit because "St. Paul did not deny coverage prior to Weiser-Brown's filing suit." On appeal, Weiser-Brown does not attack that argument as being previously-resolved or concededly baseless.

> understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This rule "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  "The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue."  *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (citing *Daubert*, 509 U.S. at 591-92).  With respect to reliability, the district court has "broad latitude" when deciding whether such testimony is reliable, and thus admissible, as well as when deciding how to test the testimony's reliability.  *Kumho*, 526 U.S. at 141-42, 152 ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable.").

The district court expressed concerns about both the relevance and reliability of Weiser-Brown's expert's testimony.  We share those concerns.  Weiser-Brown contends that Arnold's testimony would have supported its claim for bad faith, under § 541 of the Texas Insurance Code, as Arnold would have testified that St. Paul violated the "accepted practice" in the insurance

industry when it failed to send Weiser-Brown a reservation-of-rights letter.[14] In his expert report, Arnold stated: "It is clear that sometime between the assignment of the claim to BC Johnson Associated (BCJ) by [St. Paul] and the engagement of David Watson, [St. Paul] and its adjuster, BCJ, perceived a potential coverage issue that should have been disclosed to [Weiser-Brown]." Arnold was referring to the delay from June 2009, when Kachnik expressed concerns about coverage, to September 2009, when St. Paul's retained expert wrote a report that was forwarded to Weiser-Brown. Arnold's conclusory statement that St. Paul should have informed Weiser-Brown of the potential coverage problem before obtaining an expert to investigate the issue was based on Arnold's view of "[c]ustom and practice in the industry." The district court was concerned that such an untestable, conclusory statement would not assist the jury in evaluating St. Paul's claim-handling behavior. Further, the majority of Arnold's relevant work experience had been as an in-house risk manager for various oil and gas companies. Other than his work for Travelers Insurance Company, ending in 1978, Arnold's experience was from the perspective of the insured, making insurance claims. Significantly, Arnold did not know if there were any local or national standards that adjusters had to follow. While Arnold concluded in his expert report that St. Paul did not meet the standards "on how insurers are to treat their policy holders" as set forth in the Texas Insurance Code, he admitted during his deposition that he did not know whether St. Paul was required to send a reservation-of-rights letter under the Texas Insurance Code. Given the conclusory nature of his proposed testimony, coupled with his lack of knowledge regarding the Texas Insurance

---

[14] Weiser-Brown also contends that Arnold would have testified that St. Paul's summary judgment motion was improper. However, we have already concluded that the district court did not abuse its discretion when it excluded evidence of St. Paul's post-trial conduct.

No. 13-20442

Code and lack of recent experience adjusting insurance claims, we find no abuse of discretion in the district court's decision to exclude Arnold's testimony.

Accordingly, we find that the district court did not abuse its discretion in excluding certain evidence and properly granted judgment as a matter of law on Weiser-Brown's § 541 bad-faith claim.

V.

For the foregoing reasons, we AFFIRM the district court in all respects.