# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-51301

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2016

Lyle W. Cayce
Clerk

CLAUDIA AYOUB; GERALD C. AYOUB,

      Plaintiffs - Appellants

v.

CHUBB LLOYDS INSURANCE COMPANY OF TEXAS,

      Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:13-CV-58

Before DENNIS and COSTA, Circuit Judges, and ENGELHARDT,* District Judge.

GREGG COSTA, Circuit Judge:**

The principal question presented in this dispute over a homeowner's insurance policy is whether a section of the policy setting forth a "reconstruction cost less depreciation" standard for dwelling loss is a coverage provision, on which the insured has the burden of proof, or a limitation of liability provision, on which the insurer has the burden. We also have to decide

---

* Chief Judge of the Eastern District of Louisiana, sitting by designation.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-51301

how insureds can prove market value under Texas law for personal items which may have no such thing. For the reasons discussed below, we find that summary judgment in favor of the insurer was not warranted on either issue.

## I.

Claudia and Gerald Ayoub own a home in El Paso. Prior to the loss in this case, it was worth in the neighborhood of $2 million. The home was insured under a "Texas Standard Homeowners Policy" issued by Chubb Lloyds Insurance Company of Texas. Coverage A of the Policy insured the dwelling for up to $2,511,000. Coverage B insured personal property in the home for up to $1,506,600. At additional cost, the Ayoubs purchased replacement cost endorsements for both their dwelling and personal property.

The Ayoubs' home was damaged when pipes burst during a severe cold front. The Ayoubs notified Chubb, which began investigating the claim and made payments totaling close to $1 million for repairs to the dwelling and losses to personal property. A disagreement arose between Chubb and the Ayoubs regarding the full extent of the Ayoubs' covered loss. The Ayoubs sued Chubb in Texas state court to force additional payment under the Policy. In addition to their contract claims, the Ayoubs asserted statutory claims for unfair claim settlement practices and deceptive trade practices.

Chubb removed the case to federal court. After discovery, Chubb moved to exclude the testimony of two of the Ayoubs' witnesses: David Fix, an expert on dwelling replacement cost, and Mr. Ayoub. The district court struck as unreliable Fix's depreciation opinion, which was based on a figure Fix received secondhand (from the Ayoubs' insurance adjuster) and could not justify. The court refused to strike Mr. Ayoub's lay opinion "as to the value of his own property" because the objections raised by Chubb went to "its weight and credibility" rather than its admissibility.

2

No. 14-51301

Chubb then moved for summary judgment. The district court granted summary judgment on the dwelling claim because it found that the Policy obligated the Ayoubs to establish depreciation, but their only depreciation evidence had been struck as unreliable. The district court reached a similar conclusion as to the personal property claim. It found that the Ayoubs bore the burden of establishing "actual cash value" of the personal property, including depreciation, and the only evidence—Mr. Ayoub's lay opinion testimony—concerned replacement cost. Finally, the district court granted summary judgment on the statutory claims because they were "based on the alleged breach of the insurance contract." The Ayoubs timely appealed the summary judgment order.[1]

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We review the district court's grant of summary judgment de novo, construing all facts and inferences in the light most favorable to the nonmoving party. *See EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009). Because the proper interpretation of an insurance policy presents a legal question, not a factual one, the district court's interpretations of the Policy are also reviewed de novo. *See Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 878 (5th Cir. 2009).

---

[1] The Ayoubs also appealed the district court's orders excluding Fix's depreciation testimony. We find that they have forfeited that issue. The Ayoubs included the relevant orders in their notice of appeal below, and they list the admissibility of Fix's opinion in their statement of issues on appeal. But they have not explained how the court's ruling allegedly conflicted with the Federal Rules of Evidence, Texas law, or our precedent. Hinting at error is not enough to garner appellate review. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (finding issue not "adequately presented" on appeal when the issue was "mentioned in the questions presented and the summary of the argument, but the body of the brief [did] not discuss it in any depth").

No. 14-51301

A.     Dwelling claim

The first issue is whether the Ayoubs or Chubb bore the burden of proving depreciation to the dwelling. The policy's "Verified Replacement Cost Endorsement" states:

**SECTION I - CONDITIONS, Item 4. is deleted and replaced with the following:**

4.   **Loss Settlement.** Covered property losses are settled as follows:

    a.   Our limit of liability and payment for covered losses to personal property, excluding wall to wall carpeting, cloth awnings attached to the dwelling or other structures, and fences, will not exceed the smallest of the following:

        (1)   the actual cash value at the time of the loss determined with proper deduction for depreciation;

        (2)   the cost to repair or replace the damaged property with material of like kind and quality, with proper deduction for depreciation; or

        (3)   the specified limit of liability of the policy.

    b.   **Verified replacement cost.** Our limit of liability for covered losses to dwelling and other structure(s) under Coverage A (Dwelling), including wall to wall carpeting, cloth awnings attached to the dwelling or other structures, and fences, is reconstruction of:

        (1)   your dwelling up to the limit of liability shown in the declarations page; and

        (2)   other structures up to the limit of liability for other structures,

    whether or not you actually repair, replace or rebuild.

    Verified replacement cost will remain on your policy if you maintain at least 90% of the full limit of liability we recommend for your dwelling, including any adjustments by us based on appraisals, revaluations and annual adjustments for inflation. This endorsement may be removed by us if the above condition is not met. However, if this endorsement is on the policy at the time of loss, we will adjust the loss in accordance with the terms of this endorsement.

    If you have a covered partial loss to your dwelling or an other structure, and do not begin to repair, replace or rebuild the lost or damaged property within 180 days from the date of loss, we will only pay the reconstruction cost less depreciation.

The district court interpreted the last sentence of Item 4(b) as a "precondition to coverage" which the Ayoubs had to prove.

Under Texas law, an insured suing for breach of an insurance agreement bears the initial burden of proving that his loss results from a covered risk. *See Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998); *Employers Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988) *disapproved of for other reasons by State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996). But if the insurance policy contains exclusions to coverage, it is the insurer's burden to prove the exclusion applies. *See Guaranty Nat'l*, 143 F.3d at 193.

No. 14-51301

Similar rules govern an insured's damages.  The insured has the burden of proving the extent of his loss.  *See Block v. Employers Cas. Co.*, 723 S.W.2d 173, 178 (Tex. App.—San Antonio 1986), *aff'd*, 744 S.W.2d 940 (Tex. 1988); *see also* 12 Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 175:92 (3d ed. 2005) ("In accord with general principles governing the law of damages, there can be no recovery for items where their existence *and value* are not proved.  Consequently, the insured bears the burden of proof under a property insurance policy . . . ." (emphasis added)).  And if the insurance policy defines how loss will be measured, the insured is "relegated" to that measure.  *Cf. Crisp v. Security Nat'l Ins. Co.*, 369 S.W.2d 326, 327–28 (Tex. 1963) (finding that certain policy language "does not establish a contractual measure of damages to which the insured must be relegated"); *see also U.S. Fire Ins. Co. v. Stricklin*, 556 S.W.2d 575, 581–82 (Tex. App.—Dallas 1977, writ ref'd n.r.e.) (finding that jury instruction explaining "actual cash value" was "misleading" because it did not obligate the jury to "follow the contractual measure of damages").  But a contractual limitation of liability—that is, a cap on what the insurer will have to pay out, independent of the value of the loss—falls upon the insurer to plead and prove.  *See Manhattan Fire & Marine Ins. Co. v. Melton*, 329 S.W.2d 338, 339–45 (Tex. App.—Texarkana 1959, writ ref'd n.r.e.); *see also Imperial Ins. Co. v. Nat'l Homes Acceptance Corp.*, 626 S.W.2d 327, 328–30 (Tex. App.—Tyler 1981, writ ref'd n.r.e.) (holding that trial court properly allowed insureds to recover repair costs despite policy language which limited insurer's liability to "actual cash value of the property at the time of loss" in light of insurer's failure to "raise the issue of the propriety of the measure of damages until it moved for an instructed verdict").

Underlying these rules is recognition that the value of a loss can be expressed a number of different ways.  As relevant here, two possible measurements are market value and repair or replacement cost.  12 COUCH ON

5

No. 14-51301

INSURANCE § 175:24. Which particular measurement most faithfully compensates the insured for his actual loss—no more and no less—can be a "controversial question." *See id.* § 175:5; *see also Crisp*, 369 S.W.2d at 328 ("Indemnity is the basis and foundation of insurance coverage not to exceed the amount of the policy, the objective being that the insured should neither reap economic gain nor incur a loss if adequately insured."). A contractual measure of damages is one way of settling the controversy in advance. A limitation of liability can serve the same function, by indicating that the insurer will pay only the smallest of a number of different possible measurements. *See, e.g., Imperial Ins.*, 626 S.W.2d at 329 (stating that liability "shall not exceed" (1) actual cash value with deduction for depreciation, (2) repair or replacement costs with material of like kind and quality, or (3) policy limit).

This is not to say that the absence of a contractual measure of damages gives the insured absolute freedom to decide how to measure his loss. Texas law provides some default rules. In the case of a "partial loss under an insurance contract insuring a dwelling"—the loss at issue in this case—the "ordinary measure of damages . . . is the difference between the value of the property immediately before and immediately after the loss, but within the amount of the policy." *Imperial Ins. Co.*, 626 S.W.2d at 329–30; *see also Custom Controls Co. v. Ranger Ins.*, 652 S.W.2d 449, 452 (Tex. App.—Houston [1st Dist.] 1983, no writ) ("[T]he common law measure of damages . . . is the market value immediately before and immediately after the loss.").

Whether the last sentence of Item 4(b) of the Verified Replacement Cost Endorsement sets forth a contractual measure of damages that overrides the default common law standard or a limitation of liability is not an easy question. No Texas court has addressed a policy provision that is substantially similar in its overall structure and language to this one. Chubb's reading of the sentence as a measure of damage rather than a cap on coverage makes some

6

sense when the sentence is viewed in isolation: "If you have a covered partial loss to your dwelling or an other structure, and do not begin to repair, replace or rebuild the lost or damaged property within 180 days from the date of loss, we will only pay the reconstruction cost less depreciation."  The sentence is couched in terms of what Chubb will pay, rather than what Chubb's payment cannot exceed (although this seems a distinction without a difference when the sentence contains only one measurement of loss).  Also compelling, the Ayoubs purchased the endorsement for an additional premium, and it is explicitly titled "replacement cost."  This suggests that the endorsement offers a more valuable measure of damages, purchased by the Ayoubs for the express purpose of having recourse to it.  *See* 12 COUCH ON INSURANCE § 176:56 ("[W]hile a standard policy compensating an insured for the actual cash value of damaged or destroyed property makes the insured responsible for bearing the cash difference necessary to replace old property with new property, replacement cost insurance allows recovery for the actual value of property at the time of loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value.").

We are persuaded, however, that Chubb's interpretation is not reasonable in light of the Verified Replacement Cost Endorsement as a whole. *See RSUI Indemnity Co v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) ("If only one party's construction [of the policy language] is reasonable, the policy is unambiguous and we will adopt that party's construction.").  In reaching this conclusion, we heed the Texas Supreme Court's admonition not to "isolat[e] from its surroundings or consider[] apart from other provisions a single phrase, sentence, or section of a contract." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995).

The first sentence of the endorsement's dwelling provision (Item 4(b)) begins with limitation language: "Our limit of liability for covered losses . . . ."

No. 14-51301

Such language is similar to policy language that has been construed by Texas courts as limitations of liability. *Cf. Crisp*, 369 S.W.2d at 328 (stating that "liability hereunder *shall not exceed . . .*" (emphasis added)); *Imperial Ins. Co.*, 626 S.W.2d at 329 (same); *Manhattan Fire*, 329 S.W.2d at 340 (same). And Item 4(b) follows another section of the endorsement—Item 4(a), governing losses to personal property—that is undoubtedly a limitation provision under Texas case law.[2]  *Compare* Section I – Conditions, Item 4(a) ("Our limit of liability and payment for covered losses to personal property . . . will not exceed the smallest of the following: (1) the actual cash value at the time of the loss determined with proper deduction for depreciation; (2) the cost to repair or replace the damaged property with material of like kind and quality, with proper deduction for depreciation; or (3) the specified limit of liability of the policy.") *with, e.g., Imperial Ins. Co.*, 626 S.W.2d at 329 ("[L]iability hereunder shall not exceed the actual cash value of the property at the time of loss, ascertained with proper deduction for depreciation; nor shall it exceed the amount it would cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss, without allowance for any increased cost of repair or reconstruction . . .; nor shall it exceed the interest of the insured, or the specific amounts shown under 'Amount of Insurance.'"). Indeed, Chubb acknowledged at oral argument that Item 4(a) and all but the last sentence in Item 4(b) are limits of liability. In light of this, we are inclined to construe the final sentence of Item 4 consistently with its other parts.

---

[2] Item 4(a) of the Verified Replacement Cost Endorsement is superseded by the Replacement of Personal Property endorsement, discussed in the next section. But it remains instructive for determining the purpose of the Verified Replacement Cost Endorsement as a whole.

No. 14-51301

Even if this were not our inclination, Chubb's interpretation of the final sentence of Item 4(b) gives the Verified Replacement Cost Endorsement a perplexing structure. It would be unusual for policy language to first limit the insurance company's overall liability and *then* set a contractual measure of damages controlling only a subset of potential covered losses (partial losses for which repairs were not timely commenced).[3] Odder still would be reading the final sentence in Item 4(b) as placing a burden on the insurer in its first clause, and a burden on the insured in the next clause (at least absent any express language setting forth the contrasting burdens). But that is what Chubb's reading of the endorsement would require us to do. The "reconstruction cost less depreciation" language is only implicated if the policyholder does not "begin to repair, replace or rebuild the lost or damaged property within 180 days . . . ." Although it is undisputed for purposes of this appeal that the Ayoubs did not commence repairs within 180 days, that fact will be disputed in a number of cases. It makes no sense to put the onus on the insured to prove that they did not begin repairs on the dwelling within 180 days in order to have access to a *lesser* recovery—a burden they would never seek.

Chubb's interpretation of the last sentence of Item 4 as a contractual measure of damages thus creates more questions than it answers. We conclude that the better reading of the policy is that all components of Item 4 are limits

---

[3] Consider the analogy to coverage grants and exclusions described above on page 4. One would expect a policy to begin by defining what it insures, and then carve-out any exclusions. *See generally* 14 TEX. JUR. 3d *Contracts* § 249 (2015) ("An exception . . . takes out of a contract that which, but for the exception, would otherwise be included in it. . . . Ordinarily, exceptions . . . are construed as limitations on the language in the agreement that *precedes them*." (emphasis added)). And the Policy here does exactly that; it starts with the coverage grants and then establishes exclusions in a separate subsection titled "Exclusions." This sequence—from affirmative coverage to negative carve-outs—makes more sense than the structure of the Verified Replacement Cost Endorsement proposed by Chubb.

No. 14-51301

of liability on which Chubb bore the burden of proof.[4]  *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (explaining that the task of courts is to "examine and consider the entire writing in an effort to harmonize and give effect to all [of its] provisions . . ." (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).

B.     Personal property claim

The Ayoubs also purchased an endorsement entitled "Replacement of Personal Property."  The endorsement states that the Ayoubs "may" seek reimbursement "on a replacement cost basis" for items actually "repair[ed], restore[d], or replace[d]" within a year of the loss.  Otherwise, Chubb will pay the "actual cash value" of the damaged property.  The full text of the endorsement is below:

---

[4] At oral argument before this court, the Ayoubs indicated that they would need to prove the common law measure of damages at trial: the difference in market value of their home immediately before and immediately after the loss-causing event.  We express no opinion whether the Ayoubs have the evidence they need to prove that measure of damages.

No. 14-51301

For an included additional premium, our limit of liability and payment for covered loss to:

1.  personal property; and

2.  wall-to-wall carpeting and cloth awnings (Forms HO-B & HO-C only);

is extended to include Replacement Cost. Replacement Cost means there will not be a deduction for depreciation. Payment will not exceed the smallest of the following:

   a.  the Coverage B (Personal Property) limit of liability;

   b.  the replacement cost at the time of loss;

   c.  for property that is repairable, the cost of repair with material of like kind and quality with no deduction for depreciation; or,

   d.  the interest of the **insured.**

   **We do not pay the replacement cost of:**

1.  property which cannot be replaced.

2.  property not maintained in good or workable condition.

3.  property that is either obsolete or useless to the **insured** at the time of loss.

4.  watercraft including outboard motors for any replacement cost in excess of $2,500.

   We will pay replacement cost of watercraft including outboard motors up to a limit of $2,500.

5.  **property that is not repaired or replaced.**

**Loss Settlement:**

a.  We will pay you:

   1.  the replacement cost of your damaged property up to $1,500; and

   2.  the actual cash value of your remaining damaged property

      within 5 business days after we notify you that we will pay the claim.

      If you repair or replace the damaged property, you may make claim for reimbursement on a replacement cost basis for the replacement cost of your property exceeding $1,500. You must repair, restore or replace the property within 365 days after the loss. Reimbursement will be made within 5 business days after we receive proof that the property has been repaired, restored or replaced.

b.  In lieu of (a.) above, we may offer and you may accept or reject our offer to provide a replacement item of like kind and quality for your damaged property.

As with the Verified Replacement Cost Endorsement, the parties disagree whether the Replacement of Personal Property endorsement is a limitation of liability that Chubb needed to invoke and establish, or a measure of damages that the Ayoubs had to prove. The Replacement of Personal Property endorsement is unlike any policy language addressed in Texas case law that we have seen. And it is inconsistently phrased in terms of Chubb's "limit of liability," what Chubb will or will not pay, and what the Ayoubs may claim. Its scattershot and somewhat redundant organization makes it much

harder to categorize than the Verified Replacement Cost Endorsement. Because we find that summary judgment should not have been granted on this claim for another reason, as described below, we will assume that the Replacement of Personal Property endorsement defines a mandatory measure of damages for personal property not fixed or replaced within a year: "actual cash value," with a deduction for depreciation.[5]

It is undisputed that the Ayoubs did not fix or replace most of the damaged personal property within the one-year deadline. The district court granted summary judgment on this claim because the Ayoubs' only evidence of underpayment was an inventory prepared by Mr. Ayoub reflecting *replacement cost* of the affected items (clothing, housewares, and furnishings). The court found the inventory to be no evidence of "actual cash value of the items lost."

The problem with the district court's conclusion is that "actual cash value" means "market value," *Mew v. J & C Galleries, Inc.*, 564 S.W.2d 377, 377 (Tex. 1978), and Texas law acknowledges that personal effects have "no market value in the ordinary meaning of that term." *Crisp*, 369 S.W.2d at 328. Texas law thus provides considerable leeway for establishing their value. A variety of representative values are probative—including "market[,] reproduction or *replacement values*." *Id.* at 329 (alteration and emphasis added). "The trier of facts may consider *original cost and cost of replacement*, the opinions upon value given by qualified witnesses, the gainful uses to which

---

[5] The endorsement does not explicitly state that "actual cash value" includes a deduction for depreciation. But it is the clear intent of the endorsement, which elsewhere defines "replacement cost" (the alternative to "actual cash value") as *not* including "a deduction for depreciation." *See* 12 COUCH ON INSURANCE § 178:5 ("Absent an express policy provision, the intent of the parties as to whether depreciation was intended to be included can be derived from consideration of the policy as a whole, as for instance, where the policy, for a higher premium . . ., expressly excludes depreciation from a calculation of replacement cost, but is silent as to its deduction from actual cash value, implying that depreciation should be considered as to the latter valuation[.]").

the property has been put as well as any other facts reasonably tending to shed light upon the subject." *Id.* (emphasis added).  The overarching inquiry is "the actual worth or value of the articles to the owner for use in the condition in which they were at the time of the [loss] excluding any fanciful or sentimental considerations."  *Id.* at 328; *see also Allstate Ins. Co. v. Chance*, 590 S.W.2d 703, 704 (Tex. 1979) ("[T]he rule is that where household goods have no recognized market value, the trier of fact may consider, in determining the actual value to the owner at time of loss, the original cost, cost of replacement, opinions of qualified witnesses, including the owner, the use to which the property was put, as well as any other reasonably relevant facts.").

Given the broad range of evidence that is probative on actual cash value for personal property like that at issue, Mr. Ayoub's assessment of replacement costs was some evidence of actual cash value.  Summary judgment should not have been granted on this basis.

C.     Statutory claims

Finally, the district court granted summary judgment on the Ayoubs' statutory claims because they were "based on the alleged breach of the insurance contract" that the court had rejected.  As explained above, we believe that summary judgment should not have been granted on the Ayoubs' contractual claims.  Our ruling undercuts the district court's stated rationale for granting summary judgment on the Ayoubs' statutory claims.

We acknowledge the uphill battle that the Ayoubs face on these claims even if they ultimately prove that Chubb breached the contract.  Under Texas law, "[e]vidence establishing only a bona fide coverage dispute does not demonstrate bad faith." *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998).  It may well be that, if this case proceeds to trial, the Ayoubs' evidence shows nothing more than a legitimate dispute over whether Chubb owed more than the nearly $1 million it has already paid.  If so, the district

No. 14-51301

court may be justified in summarily disposing of the Ayoubs' bad faith claims. *See Weiser-Brown Op. Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 525–27 (5th Cir. 2015) (affirming district court's decision to enter judgment as a matter of law on insured's bad faith claims during a jury trial which resulted in verdict for insured on the coverage dispute).  But the arguments presented to us in this appeal have not explained in any detail why Chubb refused further payment on the claims, much less why its rationale was or was not reasonable. As such, we believe the prudent course of action is to remand and allow the district court to address this issue if it arises in the normal course.

## III.

We REVERSE the district court's grant of summary judgment in favor of Chubb on the Ayoubs' dwelling, personal property, and statutory claims and REMAND for further proceedings.

14